ACCEPTED
15-24-00114-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
12/9/2025 6:21 PM
CHRISTOPHER A. PRINE
CLERK

**No. 15-24-00114-CV**

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
12/9/2025 6:21:11 PM
CHRISTOPHER A. PRINE
Clerk

# In the Court of Appeals for the Fifteenth District of Texas

Cecile E. Young, in her official capacity as Commissioner of the Texas Health & Human Services Commission,

*Appellant,*

v.

Cook Children's Health Plan, Texas Children's Health Plan, Superior HealthPlan, Inc., and Wellpoint Insurance Company,

*Appellees.*

Appeal from the 455th Judicial District Court, Travis County, Texas, Trial Court Cause No. D-1-GN-24-003839, Hon. Laurie Eiserloh, Presiding

## Appellee Superior HealthPlan, Inc.'s Response Brief

Karen D. Walker
*Admitted Pro Hac Vice*
karen.walker@hklaw.com
Tiffany Roddenberry
*Admitted Pro Hac Vice*
tiffany.roddenberry@hklaw.com

Holland & Knight LLP
315 S. Calhoun Street, Suite 600
Tallahassee, Florida 32301
(850) 425-5612 (telephone)
(850) 224-8832 (facsimile)

Richard B. Phillips, Jr.
Texas Bar No. 24032833
rich.phillips@hklaw.com

Holland & Knight LLP
One Arts Plaza
1722 Routh Street, Suite 15500
Dallas, Texas 75201
(214) 964-9500 (telephone)
(214) 964-9501 (facsimile)

**Counsel for Appellee Superior HealthPlan, Inc.**

## IDENTITY OF PARTIES AND COUNSEL

| **Appellant** | **Counsel** |
|---|---|
| Cecile Erwin Young, in her Official Capacity as the Commissioner of the Texas Health and Human Services Commission | Ken Paxton<br>Brent Webster<br>William R. Peterson<br>William F. Cole<br>Cory A. Scanlon<br>Jeffrey A. Stephens<br>Mohmed I. Patel<br>Jennifer Cook<br>Thomas Bevilacqua<br>Stephanie Criscione<br>Reuben Blum<br>Office of the Attorney General<br>P.O. Box 12548<br>Austin, Texas 78711-2548 |

| **Appellees** | **Counsel** |
|---|---|
| Superior HealthPlan, Inc. | Richard B. Phillips, Jr.<br>Meghan McCaig[1]<br>HOLLAND & KNIGHT LLP<br>1722 Routh Street, Suite 1500<br>Dallas, Texas 75201<br><br>Karen D. Walker<br>Tiffany Roddenberry<br>HOLLAND & KNIGHT LLP<br>315 S. Calhoun Street, Suite 600<br>Tallahassee, Florida 32301 |

---

[1] Ms. McCaig is no longer associated with Holland & Knight LLP and is no longer counsel for Superior HealthPlan, Inc. in this case.

Cook Children's Health Plan

Amy Warr
Anna M. Baker
Alexander Dubose & Jefferson LLP
100 Congress Avenue, Suite 1450
Austin, Texas 78701-2709

Karen C. Burgess
Katie Dolan-Galaviz
Burgess Law PC
404 West 13th Street
Austin, Texas 78701-1825

Matthew P. Gordon
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099

Texas Children's Health Plan

Susan Feigin Harris
Warren S. Huang
Norton Rose Fulbright US, LLP
1550 Lamar, Suite 2000
Houston, Texas 77010

Paul Trahan
Norton Rose Fulbright US, LLP
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701

Thomas A. Coulter
Norton Rose Fulbright US, LLP
799 9th Street, NW, Suite 1000 Washington, D.C. 20001

| | |
|---|---|
| Wellpoint Insurance Company | Robert F. Johnson III<br>FOLEY & LARDNER LLP<br>600 Congress, Suite 3000<br>Austin, Texas 78701<br><br>Michelle Y. Ku<br>Stacy R. Obenhaus<br>FOLEY & LARDNER LLP<br>2021 McKinney, Suite 1600<br>Dallas, Texas 75201 |

# TABLE OF CONTENTS

Page

Identity of Parties and Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Index of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv

Statement Regarding Record References . . . . . . . . . . . . . . . . . . . . . xv

Statement Regarding Oral Argument. . . . . . . . . . . . . . . . . . . . . xvi

Issues Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xvii

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    1.   The RFP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    2.   The Commissioner's Ultra Vires Actions . . . . . . . . . . . . . . . 5

    3.   HHSC's Wrongful Disclosure . . . . . . . . . . . . . . . . . . . . 11

    4.   The Intended Contract Awards . . . . . . . . . . . . . . . . . . . 13

    5.   The Unlawful STAR Kids Procurement . . . . . . . . . . . . . . . 15

    6.   The Trial Court's Temporary Injunction . . . . . . . . . . . . . . . 15

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . 21

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

   1.  The trial court correctly denied the
Commissioner's plea to the jurisdiction. . . . . . . . . . . . . . 22

     A.  Appellees' claims are ripe. . . . . . . . . . . . . . . 22

     B.  Appellees were not required to exhaust
administrative remedies before bringing their
ultra vires suits. . . . . . . . . . . . . . . . . . 29

   2.  The trial court correctly concluded that
Appellees have a probable right to relief on their
ultra vires claims. . . . . . . . . . . . . . . . . . . 32

     A.  The Commissioner does not have unlimited
discretion. . . . . . . . . . . . . . . . . . . . . 32

     B.  The trial court did not abuse its discretion in
concluding that the Commissioner has acted
(and will act) ultra vires. . . . . . . . . . . . . . 34

       (1)  Appellees have standing to challenge the
Commissioner's ultra vires conduct. . . . . . . . . . . 34

       (2)  The "best value" analysis cannot trump other
specific statutory requirements. . . . . . . . . . . . 36

       (3)  The Commissioner's arguments about
Appellees' conduct are also misplaced. . . . . . . . . 38

(4) The trial court did not abuse its discretion in finding that Appellees are likely to succeed on their claims that the Commissioner failed to apply statutory mandates. . . . . . . . . . . . . . . . 42

C. The disclosure to Aetna violated basic procurement law.. . . . . . . . . . . . . . . . . . 47

D. The trial court properly applied other statutory requirements.. . . . . . . . . . . . . . . . . . 49

E. The Commissioner mischaracterizes the relief Appellees seek.. . . . . . . . . . . . . . . . . 51

3. The trial court correctly found that Superior faces irreparable harm without injunctive relief. . . . . . . . . . . . 55

A. Superior established that it is threatened with imminent, irreparable harm. . . . . . . . . . . . . . . . 56

B. The Commissioner's other arguments about irreparable harm are unavailing. . . . . . . . . . . . . . . 58

4. The trial court correctly concluded that the equities weigh in favor of Appellees. . . . . . . . . . . . . . . . . 61

5. The Commissioner's other complaints lack merit.. . . . . . . . . . . . . . . . . . . . . . . . 64

A. The injunction order complies with Rule 683. . . . . . . . . 64

(1) The Commissioner waived any complaint about the adequacy of the temporary-injunction order. . . . . 64

(2) In any event, the temporary-injunction order complies with Rule 683. . . . . . . . . . . . . . . 66

B.  The trial court did not err in declining to admit
the scoring rubrics. . . . . . . . . . . . . . . . . . . . . . . . .  68

Conclusion and Prayer . . . . . . . . . . . . . . . . . . . . . . . . . . . .  72

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Appendix

A  —  Temporary Injunction
(CR:5875). . . . . . . . . . . . . . . . . . . . . . . . . . .  Tab A

B  —  TEX. GOV'T CODE § 533.003
(now TEX. GOV'T CODE § 540.0204) . . . . . . . . . .  Tab B

C  —  TEX. GOV'T CODE § 533.0035
(now TEX. GOV'T CODE § 540.0203) . . . . . . . . . .  Tab C

D  —  TEX. GOV'T CODE § 533.004
(now TEX. GOV'T CODE § 540.0206) . . . . . . . . . .  Tab D

E  —  TEX. GOV'T CODE § 536.052
(now TEX. GOV'T CODE § 543A.0052) . . . . . . . . .  Tab E

F  —  TEX. GOV'T CODE § 2155.144 . . . . . . . . . . . . .  Tab F

G  —  TEX. HEALTH & SAFETY CODE § 62.155 . . . . . .  Tab G

# Index of Authorities

Page

## Cases

*31 Holdings I, LLC v. Argonaut Ins. Co.*,
    640 S.W.3d 915 (Tex. App.—Dallas 2022, no pet.). . . . . . . . . . . 22

*Abbott v. Doe*,
    691 S.W.3d 55 (Tex. App.—Austin 2024, no pet.) . . . . . . . . . . 23

*AutoNation, Inc. v. Hatfield*,
    186 S.W.3d 576 (Tex. App.—Houston [14th Dist.] 2005,
    no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Cantu v. Horany*,
    195 S.W.3d 867 (Tex. App.—Dallas 2006,
    no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*City of Austin v. Utility Assocs., Inc.*,
    517 S.W.3d 300 (Tex. App.—Austin 2017,
    pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*City of Dallas v. Brown*,
    373 S.W.3d 204 (Tex. App.—Dallas 2012,
    pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*City of El Paso v. Heinrich*,
    284 S.W.3d 366 (Tex. 2009). . . . . . . . . . . . . . . . . . . . . . . . . 55

*Crosstex Energy Servs. LP v. Pro Plus, Inc.*,
    430 S.W.3d 384 (Tex. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Duarte v. Disanti*,
    292 S.W.3d 733 (Tex. App.—Dallas 2009,
    no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*E&L Constr. Grp., LLC v. U.S.*,
    159 Fed. Cl. 115 (2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Elcon Enters., Inc. v. Wash. Metro. Area Transit Auth.*,
977 F.2d 1472 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . 34

*Emerson v. Fires Out, Inc.*,
735 S.W.2d 492 (Tex. App.—Austin 1987,
no writ). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Etan Indus., Inc. v. Lehmann*,
359 S.W.3d 620 (Tex. 2011) . . . . . . . . . . . . . . . . . . 23

*Frank v. Liberty Ins. Corp.*,
255 S.W.3d 314 (Tex. App.—Austin 2008,
pet. denied) . . . . . . . . . . . . . . . . . . . . . . 40, 42

*Function Media, L.L.C. v. Google, Inc.*,
No. 2:07–CV–279–CE, 2010 WL 276093 (E.D. Tex.
Jan 15, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Gunn v. McCoy*,
554 S.W.3d 645 (Tex. 2018) . . . . . . . . . . . . . . . . . . 72

*Hall v. McRaven*,
508 S.W.3d 232 (Tex. 2016). . . . . . . . . . . . . . . . 32, 33

*Hensley v. State Comm'n on Judicial Conduct*,
692 S.W.3d 184 (Tex. 2024). . . . . . . . . . . . . . . . 30, 31

*Hoist Liftruck Mfg., Inc. v. Carruth-Doggett, Inc.*,
485 S.W.3d 120 (Tex. App.—Houston [14th Dist.] 2016,
no pet.) (Frost, C.J., concurring) . . . . . . . . . . . . . . . 65

*Horizon/CMS Healthcare Corp. v. Auld*,
34 S.W.3d 887 (Tex. 2000) . . . . . . . . . . . . . . . . . . 37

*Houston Belt & Terminal Ry. Co. v. City of Houston*,
487 S.W.3d 154 (Tex. 2016) . . . . . . . . . . . . . . . . *passim*

*In re State*,
711 S.W.3d 641 (Tex. 2024) (orig. proceeding) . . . . . . . . . . . 62

*In re Stetson Renewables Holdings, LLC*,
658 S.W.3d 292 (Tex. 2022) (orig. proceeding) . . . . . . . . . . . 52, 53

*Marble Falls Indep. Sch. Dist. v. Scott*,
275 S.W.3d 558 (Tex. App.—Austin 2008,
pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Matzen v. McLane*,
659 S.W.3d 381 (Tex. 2021) . . . . . . . . . . . . . . . . . . . 54

*McGarry v. Houston Firefighters' Relief & Ret. Fund*,
680 S.W.3d 14 (Tex. App.—Houston [1st Dist.] 2023,
pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Morath v. Kingsville Indep. Sch. Dist.*,
710 S.W.3d 918 (Tex. App.—15th Dist. 2025,
no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 54

*Omniplex World Servs. Corp. v. U.S.*,
105 Fed. Cl. 706 (2012) . . . . . . . . . . . . . . . . . . . . . . 35

*Phillips v. McNeill*,
635 S.W.3d 620 (Tex. 2021) . . . . . . . . . . . . . . . . . . . 54

*Riner v. City of Hunters Creek*,
403 S.W.3d 919 (Tex. App.—Houston [14th Dist.] 2013,
no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*Ritchie v. Rupe*,
443 S.W.3d 856 (Tex. 2014) . . . . . . . . . . . . . . . . . . . 36

*S.O. v. Univ. of Tex.*,
No. 03-16-00726-CV, 2017 WL 2628072 (Tex. App.—
Austin June 15, 2017, no pet.) . . . . . . . . . . . . . . . . . . 23

*State v. Loe*,
692 S.W.3d 215 (Tex. 2024) . . . . . . . . . . . . . . . . . . . 22

*Sw. Elec. Power Co. v. Lynch*,
595 S.W.3d 678 (Tex. 2020) . . . . . . . . . . . . . . . . . 23, 28

*Sw. Life Ins. Co. v. Montemayor*,
　24 S.W.3d 581 (Tex. App.—Austin 2000,
　pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Taylor Hous. Auth. v. Shorts*,
　549 S.W.3d 865 (Tex. App.—Austin 2018,
　no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 65

*Tex. Dep't of Parks & Wildlife v. Miranda*,
　133 S.W.3d 217 (Tex. 2004) . . . . . . . . . . . . . . . . . . . 21

*Tex. Educ. Agency v. Hous. Indep. Sch. Dist.*,
　660 S.W.3d 108 (Tex. 2023) . . . . . . . . . . . . . . . . . . . 21

*Tex. Propane Gas Ass'n v. City of Houston*,
　622 S.W.3d 791 (Tex. 2021) . . . . . . . . . . . . . . . . . 32

*Tex. Tech Univ. Health Sci. Ctr. v. Rao*,
　105 S.W.3d 763 (Tex. App.—Amarillo 2003,
　pet. dism'd) . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Transp. Co. of Texas v. Robertson Transports, Inc.*,
　261 S.W.2d 549 (Tex. 1953) . . . . . . . . . . . . . . . . . 66

*Turner v. Joshua Indep. Sch. Dist.*,
　583 S.W.2d 939 (Tex. App.—Waco 1979,
　no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*VAS Realty, LLC v. U.S.*,
　26 F.4th 945 (Fed. Cir. 2022) . . . . . . . . . . . . . . . . . 35

*Vote.Org v. Callanen*,
　39 F.4th 297 (5th Cir. 2022) . . . . . . . . . . . . . . . . . 61

*Wilson v. Cmty. Health Choice Texas, Inc.*,
　607 S.W.3d 843 (Tex. App.—Austin 2020,
　pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## STATUTES

Act of May 19, 2023, 88th Leg., R.S., Ch. 769, sec. 1.01 . . . . . . . . . . . 2

Act of May 27, 2019, 86th Leg., R.S., Ch. 1353, art. IX, §
    17.10(e), 2019 Tex. Gen. Laws 4035, 4929. . . . . . . . . . . . . . . . . 63

Act of May 31, 2021, 87th Leg., R.S., Ch. 1053, art. IX, §
    17.09(e), 2021 Tex. Gen. Laws 2805, 3695. . . . . . . . . . . . . . . . . 63

TEX. GOV'T CODE § 311.016(2) . . . . . . . . . . . . . . . . . . . . . . . 40

TEX. GOV'T CODE § 311.026. . . . . . . . . . . . . . . . . . . . . . . . . 37

TEX. GOV'T CODE § 524.0002 . . . . . . . . . . . . . . . . . . . . . . . 32

TEX. GOV'T CODE § 533.003 . . . . . . . . . . . . . . . . . . . . . . *passim*

TEX. GOV'T CODE § 533.004 . . . . . . . . . . . . . . . . . . . . . . *passim*

TEX. GOV'T CODE § 533.0035. . . . . . . . . . . . . . . . . 4, 9, 10, 49

TEX. GOV'T CODE § 536.052 . . . . . . . . . . . . . . . . . . . . . *passim*

TEX. GOV'T CODE § 540.0203. . . . . . . . . . . . . . . . . . . . . . . . 4

TEX. GOV'T CODE § 540.0204 . . . . . . . . . . . . . . . . . . . . . . . 6

TEX. GOV'T CODE § 540.0206 . . . . . . . . . . . . . . . . . . . . . . . 2

TEXAS GOV'T CODE § 543A.0052 . . . . . . . . . . . . . . . . . . . . . . 7

TEX. GOV'T CODE § 2155.144 . . . . . . . . . . . . . . . . . . . . . *passim*

TEX. HEALTH & SAFETY CODE § 62.155 . . . . . . . . . . . . . 8, 50, 51

## REGULATIONS AND RULES

1 T.A.C. § 391.101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 47

1 T.A.C. § 391.209(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . 13, 47

Page

TEX. R. CIV. P. 296 . . . . . . . . . . . . . . . . . . . . . . . . 67

TEX. R. CIV. P. 683 . . . . . . . . . . . . . . . . . . . . . . *passim*

TEX. R. EVID. 803(6) . . . . . . . . . . . . . . . . . . . . . . 71

# STATEMENT OF THE CASE

***Nature of the Case:*** This case arises from the procurement conducted by the Texas Health and Human Services Commission ("HHSC") for managed healthcare services for the State of Texas Access Reform Medicaid program and the Children's Health Insurance Program. (CR:3511–12.) Appellees assert that Appellant Cecile E. Young, in Her Official Capacity as Executive Commissioner of HHSC (the "Commissioner") has acted (and will continue to act) ultra vires in the conduct of the procurement. (*Id.*) They filed suit seeking declaratory and injunctive relief to stop the ultra vires conduct. (CR:3550–56.)

***Course of Proceedings:*** The Commissioner agreed not to take further action on the procurement until a hearing on Appellees' application for a temporary injunction. (CR:2629.) The Commissioner filed a plea to the jurisdiction. (CR:2949.) Following expedited discovery, the trial court conducted a four-day hearing on the application for a temporary injunction. (*See generally* 5RR, 6RR, 7RR, 8RR.)

***Trial Court's Disposition:*** The trial court denied the Commissioner's plea to the jurisdiction. (CR:5875.) The court also found that Appellees have a likelihood of success on the merits of their ultra vires claim, that they face imminent irreparable harm, and that the equities weigh in favor of injunctive relief. (*Id.*) The court therefore granted a temporary injunction prohibiting the Commissioner from continuing with the procurement. (*Id.*)

# Statement Regarding Record References

The record on appeal comprises the following:

- the one-volume clerk's record filed in this Court on November 1, 2024, which will be cited as "CR:[page];"

- the 20-volume reporter's record filed in this Court on October 29, 2024, which will be cited as "[volume]RR:[page];" and

- a one-volume supplemental reporter's record filed in this Court on November 4, 2024, which will be cited as "Supp.RR:[page]."

The exhibits from the temporary injunction hearing are in volumes 9 through 20 of the reporter's record and will be cited as "Ex. P-[number]" or "Ex. D-[number]."

## STATEMENT REGARDING ORAL ARGUMENT

Given the significance of the procurement and the importance of the issues presented in this appeal, Superior HealthPlan, Inc. ("Superior") requests oral argument, which will give the Court the opportunity to fully vet the parties' arguments and obtain any clarifications necessary to decide the case.

# Issues Presented

1. The trial court correctly denied the Commissioner's plea to the jurisdiction because (a) Appellees have asserted viable ultra vires claims; (b) those claims are ripe; and (c) Appellees were not required to exhaust administrative remedies before bringing their claims.

2. The trial court did not abuse its discretion in entering the temporary injunction because (a) Appellees have a likelihood of success on the merits of their ultra vires claims; (b) Appellees face imminent irreparable harm; (c) the equities favor injunctive relief; (d) the injunctive order fully complies with Texas Rule of Civil Procedure 683; and (e) the trial court did not abuse its discretion in excluding the individual completed scoring rubrics.

## INTRODUCTION

Appellant Cecile E. Young, in Her Official Capacity as the Executive Commissioner (the "Commissioner") of the Texas Health and Human Services Commission ("HHSC") failed to follow statutory mandates during the largest procurement in state history—for contracts to provide managed healthcare for over 1.5 million vulnerable Texans for 10 years, involving total payments of over $100 billion. The Legislature carefully prescribed standards for awarding these contracts, including required preferences based on existing provider networks and quality to ensure a certain level of value in contracted managed care contracts. The Commissioner acted in direct contravention of those requirements in many respects. In so doing, she has acted outside the bounds of her discretion and thus has acted (and will continue to act) ultra vires. The trial court correctly denied the Commissioner's plea to the jurisdiction and correctly granted a temporary injunction to prevent the execution of the unlawfully awarded contracts. This Court should affirm.

## STATEMENT OF FACTS

### 1.  The RFP

This case arises from HHSC's most recent attempt to procure contracts worth in total over $100 billion for the State of Texas Access Reform

("STAR") Medicaid program and the Children's Health Insurance Program ("CHIP") (together, "STAR & CHIP"). (CR:3512.) HHSC cancelled two prior failed procurements (in 2018 and 2020) without awarding any contracts. (5RR:180; 6RR:233.)

In December 2022, HHSC issued Request for Proposals No. HHS0011152 (the "RFP") soliciting proposals for STAR & CHIP managed care services in all 13 service areas ("SAs") throughout the State. (CR:3519; 5RR:76–77 & Ex. P-38.) The RFP required respondents to designate and rank the SAs in which they wanted to provide services. (CR:3520; 5RR:76–77 & Ex. P-38 § 2.5.2.)

Texas Government Code section 533.004[2] requires HHSC to award certain Medicaid managed-care contracts (including STAR) to managed care organizations ("MCOs") that meet the statute's requirements (each a "mandatory contract"). *See* TEX. GOV'T CODE § 533.004(a). The RFP required

---

[2] Portions of Texas Government Code Chapter 533 were repealed and recodified as part of "the nonsubstantive revision of the health and human services laws governing the Health and Human Services Commission, Medicaid, and other social services." Act of May 19, 2023, 88th Leg., R.S., Ch. 769, sec. 1.01. Section 533.004 has been recodified as Texas Government Code section 540.0206. *Id.* Because the applicable statutes were in Chapter 533 at the time of the temporary-injunction hearing, and for consistency of reference, Superior will continue to refer to the sections in Chapter 533.

respondents asserting a Section 533.004 claim to provide documentation to substantiate any claim to a mandatory contract. (Ex. P-38 § 3.1.2.)

The RFP describes a multistage evaluation process:

- Initial compliance screening (Ex. P-38 § 3.1.3))

- Scoring responses to technical questions (*id.*)

- Oral presentations by:

  - All respondents with a valid section 533.004 mandatory contract claim (regardless of score on technical questions) (CR:3521; 5RR:76–77 & Exs. P-38 §§ 3.1.3.3, 3.1.6 & P-284 at 6)

  - All other respondents with scores on the technical questions in the competitive range (CR:3521; 5RR:76–77, 79–80 & Exs. P-38 § 3.1.3.3 & P-284 at 5–6)

The RFP identified the four topics to be addressed during oral presentations. (CR:3521; 5RR: 76–77 & Ex. P-38 § 3.1.5.) Each respondent's final weighted score was determined by combining the weighted technical-question score with the weighted oral-presentation score. (CR:3521; 5RR:76–77 & Ex. P-38 §§ 3.1.5, 3.1.6; 5RR:208–09.)

The RFP also sets forth a methodology for determining contract awards. (CR:3521–22; 5RR:76–77 & Ex. P-38 § 3.1.7.3.) Under the RFP's formulaic approach:

- in each SA where only one respondent has a validated section 533.004 mandatory-contract claim, that respondent will be assigned to the SA without any consideration of scores;

- in each SA where more than one respondent has a validated mandatory-contract claim, the respondent with the highest final weighted score of those respondents with a validated mandatory-contract in the SA will be assigned to the SA, and all other respondents with a validated mandatory-contract claim will be considered in the same manner as respondents without a validated mandatory-contract claim;[3] and

- after assignment of respondents with validated mandatory-contract contract claims, respondents will be assigned to SAs in descending order based on each respondent's final weighted score until the maximum number of MCOs per SA has been assigned, using each respondent's ranked order of preference up to a maximum of seven SA assignments per respondent. (CR:3521–22; 5RR:76–77 & Ex. P-38 § 3.1.7.3.)

The RFP requires HHSC to certify that each respondent recommended for an award is "reasonably able to fulfill the terms of the Contract, as required by Texas Government Code Section 533.0035." (CR:3522; 5RR:76–77 & Ex. P-38 § 3.1.7.5.)[4] The RFP states that failure to obtain this certification "will result in no further consideration for Contract award, and another Respondent

---

[3] No SA had more than one respondent with a validated mandatory-contract claim. (5RR:79–80 & Ex. P-284 at 3–4.)

[4] Section 533.0035 has been recodified as Texas Government Code section 540.0203.

may be considered for Contract award in accordance with this section." (CR:3522; 5RR:76–77 & Ex. P-38 § 3.1.7.5.)

## 2. The Commissioner's Ultra Vires Actions

Multiple sections of the Texas Government Code and the Texas Health and Safety Code establish requirements that the Commissioner must follow in conducting the STAR & CHIP procurement. And Texas Government Code section 2155.144 requires that the Commissioner document the consideration of relevant factors. *See* TEX. GOV'T CODE § 2155.144(c). Although the RFP indicated that HHSC would follow these requirements in contract awards (Ex. P-38 § 3.1.4; 6RR:99-100; Ex. P-38 at 25), HHSC, led by the Commissioner, did not do so. Appellees established that the Commissioner has acted and will act ultra vires in at least the following ways:

*First*, in determining the intended contract awards, HHSC, under the Commissioner's direction, failed to "give preference to organizations that have significant participation in the organization's provider network from each health care provider in the region who has traditionally provided care to Medicaid and charity care patients" as required by Texas Government Code

section 533.003.[5] James Ramirez, who was HHSC's director of the major procurements office for Medicaid and CHIP during the procurement, admitted at the temporary-injunction hearing that section 533.003(a)(1) is mandatory, that it requires HHSC to give a preference based on existing provider networks, and that it requires those networks to be evaluated by region. (5RR:221–23.) But the proposals were not divided by region, and there was no scoring based on region. (5RR:97–98.) Nor did HHSC consider publicly available information that would demonstrate the extent of the respondents' existing provider networks. (CR:3534–35; 5RR:98.) HHSC's training for the evaluators failed to instruct them to consider any respondent's existing provider network, much less any respondent's existing network by region, or whether the network includes providers that have traditionally provided Medicaid and charity care. (5RR:88–90.) Nor did HHSC instruct evaluators to give any preference as required by section 533.003(a)(1) or otherwise inform evaluators about the required statutory preference based on provider networks. (5RR:88–89 ("Q. HHSC didn't instruct the evaluators on the Section 533.003 or 536.052 preferences, did it? A. No.").)

---

[5] Section 533.003 has been recodified as Texas Government Code section 540.0204.

***Second***, in determining the intended contract awards, HHSC, under the Commissioner's leadership, failed to give preference to organizations that have successfully implemented quality initiatives or meet quality of care and cost-efficiency benchmarks as required by Texas Government Code section 536.052(d). (CR:3535–38; 5RR:88–89; 5RR:100–03.)[6] The Commissioner admitted in public testimony before the House Human Services Committee that existing quality metrics were not considered in making the contract awards; rather, HHSC considered what the respondents promised to do in the future. (6RR:162–64; Ex. P-148 at 64–65.) The evaluators were not informed of the mandatory quality preference, nor did they receive any training indicating that they should provide a preference based on quality initiatives or benchmarks. Kay Molina, HHSC's deputy executive commissioner for procurement and contracting services, testified that evaluators received no instruction about consideration of past implementation of quality initiatives and would not have considered it unless a respondent happened to include that information in their proposal. (5RR:102–04.)

---

[6] Section 536.052 has been recodified without substantive change at Texas Government Code section 543A.0052.

***Third***, HHSC, under the Commissioner's direction, is proposing to unlawfully award CHIP contracts to respondents that HHSC has found to satisfy the requirements for a mandatory contract under Texas Government Code section 533.004, even though that section applies *only* to Medicaid programs (such as STAR) but not to CHIP, which is not a Medicaid program. Aside from section 533.004, this action would also violate Texas Health & Safety Code section 62.155, which requires HHSC to competitively procure CHIP contracts without any mandatory contract set-aside. Tex. Health & Safety Code § 62.155. Kay Molina conceded that section 533.004 does not apply to CHIP. (5RR:111.) Instead, under the "guise" of a best-value determination, HHSC intends to award CHIP contracts to those respondents HHSC has determined are entitled to a mandatory contract under section 533.004 without any statutory authority and without considering the procurement scores. (5RR:125–26.) In fact, HHSC intends to award a CHIP contract to every respondent in the STAR & CHIP procurement that claimed entitlement to a Medicaid mandatory contract under section 533.004, regardless of that respondent's score, including the respondent that came in last place out of all 18 respondents. (6RR:59, 157.)

In response to a protest to the STAR & CHIP RFP submitted by Wellpoint (formerly Amerigroup) before the proposal deadline, HHSC considered amending the RFP to provide for mandatory-contract awards only for STAR contracts, with CHIP awards being determined based on scoring. (6RR:51–52.) But the Commissioner decided that HHSC should deny Wellpoint's protest and not amend its process. (6RR:153–54; 8RR:70.) By allowing HHSC to move forward with contracts that unlawfully award CHIP contracts based on a respondent's eligibility for a mandatory contract under section 533.004, the Commissioner will exceed the scope of her legal authority. (CR:3538–40.)

*Fourth*, HHSC, under the Commissioner's leadership, failed to address the considerations in Texas Government Code sections 533.003 and 533.0035 as required section 533.004(a), before making mandatory-contract awards for STAR contracts. Tex. Gov't Code § 533.004(a). Those considerations include whether the bidder has significant participation in its network by providers who traditionally provide Medicaid and charity care in the SA and certification that the bidder is reasonably able to fulfill the terms of the contract. *See* Tex. Gov't Code §§ 533.003, 533.0035. The mandatory-contract awards would be ultra vires because the HHSC, under the Commissioner's leadership has not addressed the required elements in Section

533.003(a) in making mandatory-contract award decisions. (CR:3541–42; 5RR:124–26.)

*Fifth*, the Commissioner intends to award contracts that do not comply with HHSC's obligation under Texas Government Code section 533.0035 to "evaluate and certify that the organization is reasonably able to fulfill the terms of the contract, including all requirements of applicable federal and state law" before awarding a contract. Rather than conducting its own investigation into whether a respondent could fulfill the contract's terms, HHSC simply relied on each respondent's self-certification. (CR:3532; 5RR:266–68 & Ex. P-192; *see also* 5RR:274 ("Q. And so HHSC just took as to true anything that an MCO put in their responses to the specific certification questions; is that correct? A. Yes. We relied on the representation of truth and accuracy that's made in the context of submitting a response, yes.").) Because the statute requires certification by HHSC, not self-certification, if the Commissioner proceeds with finalizing the intended contract awards, they will violate this statute.

*Sixth*, HHSC did not document its consideration of the relevant best-value criteria as required by Texas Government Code section 2155.144(c). The requirement that HHSC document that it has considered all relevant

best-value factors is mandatory, not discretionary. (CR:3533, 3549; 5RR:107–08, 169, 226–27.) The Commissioner cannot show that HHSC's intended contract awards comply with the requirement in section 2155.144(c) to document that HHSC considered all relevant factors, including, but not limited to, quality and past performance.

### 3. HHSC's Wrongful Disclosure

The procurement is also fundamentally flawed because the Commissioner intends to proceed with the intended contract awards knowing that HHSC erroneously disclosed proposals (including Superior's) to third parties, including one of Superior's competitors, while the procurement was ongoing. (CR:3526–27; 5RR:129, 137–40.) This wrongful disclosure undermined the procurement's integrity, destroying any level playing field. (CR:3526–27; 5RR:126–29; 6RR:14–16 (government-procurement expert's testimony that the disclosure irretrievably compromised the procurement's integrity).)

In August 2023, while the procurement was still ongoing, HHSC improperly disclosed the proposals to third parties. (CR:3526–27, 3588–3602; 5RR:129, 135–38; 6RR:161–62.) The proposals were disclosed to legal counsel for Aetna, a respondent to the RFP. This same information was not available

to other respondents, including Superior. The disclosure happened *during the evaluation of proposals and before Aetna's oral presentation.* (CR:3526, 3588–92; 5RR:137–40.) In January 2024, months after wrongfully disclosing the proposals, HHSC recognized its error. It emailed the recipients of the erroneously disclosed proposals asking that the proposals be destroyed, but this attempted cure was too late. (CR:3527; 5RR:138–39, 142–45 & Exs. P-78, P-80, P-81.) Moreover, HHSC did not confirm, and does not know, whether all the copies were destroyed. (CR:3527; 5RR:138–39.)

This improper disclosure of the proposals to Aetna destroyed the procurement's integrity and created an unlevel playing field where Aetna enjoyed an unfair competitive advantage going into its oral presentations. (CR:3526–27; 6RR:15, 31–32.) Aetna is an intended contract awardee under the Commissioner's notice of intent to award contracts. (CR:3562.) The RFP identified the subjects for oral presentations. (CR:3526–27; 5RR:76–77 & Ex. P-38 § 3.1.5; 5RR:140.) All the subjects were covered in each respondent's proposal. (CR:3526–27.) Wellpoint's representative testified that the disclosed copy of its proposal reflected Wellpoint's strategy relating to subcontracting, and he explained how Wellpoint's competitors could have used that information in preparing for their oral presentations. (6RR:35–37 &

Ex. P-236; 8RR:88–89.) Thus, the undisputed evidence demonstrated that Aetna could use the information in its competitors' proposals to bolster its own oral presentation and undercut its competitors. (CR:3526–27; 6RR:30–32, 37.)

HHSC's release of the proposals before the oral presentations and while the evaluation was ongoing irretrievably compromised the procurement's integrity. (CR:3528, 3603–39; *see also* 6RR:16–17.) The procurement process did not provide fair consideration of proposals as required by 1 T.A.C. section 391.209(3)(A), and it was far from consistent, uniform, and transparent, as required by 1 T.A.C. section 391.101. (CR:3546–47, 3588–3639; *see also* 6RR:16–17.) Thus, HHSC failed to follow applicable law requiring a consistent and uniform procurement process, fair consideration of proposals, and transparency as required by HHSC's own rules governing the procurement. (CR:3528; *see also* 6RR:16–17.) This occurred under the Commissioner's oversight, and she authorized the intended contract awards knowing of the wrongful proposal disclosure.

### 4. The Intended Contract Awards

In March 2024 (after oral presentations were scored), HHSC, under the Commissioner's direction, issued notice of the intended contract awards from

the RFP. (*See* CR:3523–24; 5RR:81–82 & Ex. P-95.) As shown above, these intended contract awards are based on a procurement process in which HHSC, under the Commissioner's leadership, violated statutory procurement requirements. Thus, if the intended contract awards are finalized, the Commissioner will exceed her authority under the statutes governing HHSC's procurement of Medicaid and CHIP managed care contracts and will negatively impact more than 1.5 million children, pregnant mothers, and families throughout the State of Texas. (*See* CR:3512, 3514, 3524–25, 3555–56, 3585–87; 7RR:102–04.) The ultra vires intended contract awards will have devastating implications for STAR & CHIP members, healthcare providers, and the Texas Medicaid managed care system as a whole. (CR:3512, 3514, 3518, 3524–25, 3555–56; *see also* 6RR:144 (Commissioner conceding that the intended contract awards will require more than 1.5 million Texans to change health plans).) A substantial number of Texas's most vulnerable citizens would be forced to change health plans at a level without precedent in this state or any other. Those STAR & CHIP members would be left to choose lower-quality plans with less developed provider networks than they have today. Superior seeks prospective relief prohibiting the Commissioner from

finalizing awards made under a process that violates the Commissioner's lawful authority. (CR:3525–26.)

### 5. The Unlawful STAR Kids Procurement

In May 2024, HHSC issued Request for Proposals No. HHS0013071 (the "STAR Kids RFP") seeking bids for STAR Kids, a separate Texas Medicaid managed care program that provides benefits to disabled children and young adults. (CR:3530.) The STAR Kids RFP is nearly identical to the STAR & CHIP RFP. (CR:3530; *see also* 5RR:78; 6RR:229–30.) HHSC developed the process for both procurements together. Kay Molina and James Ramirez testified that HHSC is using the same process for the STAR Kids RFP that it used for the STAR & CHIP RFP and that the statutory mandates will be treated the same. (5RR:78; 6RR:229–30.) In other words, HHSC will fail to apply the statutorily required preferences, and the Commissioner again will act ultra vires if she awards contracts based on the same process. (CR:3530.)

### 6. The Trial Court's Temporary Injunction

After a four-day evidentiary hearing with 11 witnesses (including the Commissioner) testifying, the trial court denied the Commissioner's plea to the jurisdiction and enjoined the Commissioner from awarding, signing, executing, or taking any other action to implement the intended contract awards

under the RFP. (CR:5883.) The court also enjoined the Commissioner from proceeding with the STAR Kids RFP. (*Id.*)

The trial court found that "[Appellees] have established a cause of action against [the Commissioner] and a probable right to the relief sought on their claims that [the Commissioner] has violated and, unless enjoined, will continue to violate statutory and regulatory requirements applicable to the RFP." (CR:5876.) The court specifically found that "[Appellees] have established that [the Commissioner] has violated and will continue to violate the Texas Government Code, Texas Health and Safety Code, and Texas Administrative Code in procuring managed care contracts for STAR & CHIP in Texas." (CR:5877.) The court determined that "sovereign immunity does not bar [Appellees'] claims or deprive the [trial court] of subject-matter jurisdiction" because "[Appellees] properly seek only prospective relief—specifically injunctive relief prohibiting [the Commissioner] from awarding, executing, or otherwise implementing the intended RFP contract and thus preventing further unlawful acts in connection with Defendants' procurement or contracting processes, as well as accompanying declaratory relief." (CR:5876.) The court also made specific findings about the ways the Commissioner has and will continue to act ultra vires unless enjoined. (CR:5877–78.)

The court also concluded that each Appellee would suffer irreparable harm without injunctive relief. (CR:5879–82.) Superior's harm includes (i) loss of members even before the proposed contracts' implementation; (ii) loss of employees that would occur almost immediately upon any contract awards becoming final; (iii) loss of providers participating in Superior's network because of the uncertainty and lack of leverage in provider negotiations; (iv) loss of investments in strategic partnerships intended to scale over time; (v) and a decrease in Superior's ability to continue to offer the same level of service under its existing contract in the time leading up to the proposed contracts' implementation. (CR:5880–81.) The court found that money damages would not be adequate compensation because the harm to Superior and the other Appellees harm cannot be measured by any certain pecuniary standard and because the Commissioner would be immune from any damages claims. (CR:5882.)

The court also found that the potential harm to Appellees outweighs any potential harm to the Commissioner or HHSC from maintaining the status quo, considering HHSC has extended STAR & CHIP contracts in the past. (*Id.*) Finally, the court found that the public will not be harmed by a temporary injunction but would suffer harm without injunctive relief, particularly given

that more than 1.5 million STAR & CHIP members would be forced to change health plans. (CR:5883–84.)

The Commissioner appealed the denial of her plea to the jurisdiction and the grant of the temporary injunction.

## Summary of Argument

The trial court correctly denied the Commissioner's plea to the jurisdiction because Appellees have pleaded viable ultra vires claims. They have pleaded and shown that the Commissioner has acted (and will act) outside the bounds of her discretion. Contrary to the Commissioner's arguments, those claims are ripe. Her statements at the temporary-injunction hearing and in her filings in this Court show that she stands ready to execute the proposed contracts. And because the Commissioner is acting ultra vires, Appellees were not required to exhaust administrative remedies before seeking injunctive relief in court.

The trial court did not abuse its discretion in entering the temporary injunction. Appellees have established a likelihood of success on their ultra vires claims. Contrary to the Commissioner's argument, she does not have unlimited discretion in conducting the procurement and awarding these contracts.

The Commissioner has no discretion to ignore mandatory statutory prefer- ences. But the evidence shows that the procurement failed to apply the required preferences. The evidence also establishes that, during the procure- ment, HHSC improperly disclosed proposals to other bidders, including Aetna. That disclosure created an uneven playing field and gave Aetna an un- fair advantage, and the Commissioner is acting ultra vires by proceeding with contract awards with knowledge of the improper disclosure. The relief Appel- lees seek (a declaration that the Commissioner is acting ultra vires and an injunction to stop the ultra vires conduct) is the appropriate remedy. Once the courts determine that the Commissioner's conduct is ultra vires, it will be up to the Commissioner (not the courts) to determine a path forward that is com- pliant with state law. The Court should reject the Commissioner's efforts to mischaracterize the relief Appellees seek.

The trial court also correctly concluded that Appellees will suffer irrepa- rable harm without immediate injunctive relief. The court heard undisputed testimony that if the Commissioner proceeds with executing the proposed contracts, Superior will likely suffer destabilization of its workforce, its mem- bership, and its provider networks. Money damages would be insufficient to

cure this harm (and would likely be barred by sovereign immunity). The Commissioner does not challenge the trial court's fact findings about irreparable harm but argues about whether that harm supports injunctive relief. None of the Commissioner's arguments supports reversal of the imminent harm findings.

The trial court also correctly found that the public interest favors an injunction. The Commissioner ignores that this suit's entire purpose is to reassert the state's control over an official who is acting outside her discretion. The state has no interest in protecting or continuing the Commissioner's ultra vires conduct. And it is in the public interest to ensure that the Commissioner follows the law in this procurement process.

The Commissioner's other arguments for reversal also fail. The injunction order fully complies with Rule 683 because it specifically explains why an injunction is necessary to prevent irreparable harm to Appellees. In any event, the Commissioner waived these complaints by not raising them in the trial court. Nor did the trial court abuse its discretion in excluding the individual scoring rubrics. The Commissioner waived any argument about the exclusion

by failing to address in this Court all grounds for exclusion. Nor can the Commissioner show that the evidence was admissible under the business-record exception or that its exclusion was harmful.

## STANDARD OF REVIEW

This Court reviews the trial court's ruling on the plea to the jurisdiction de novo. *Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 160 (Tex. 2016). The Commissioner has challenged whether Appellees' pleadings are sufficient to establish jurisdiction. (CR:2960; EC Br. at 11–16.) In reviewing the pleadings, this Court "construe[s] the pleadings liberally in the pleaders' favor and look[s] to their intent." *Id.* "Only if the pleadings affirmatively negate jurisdiction should the plea to the jurisdiction be granted without affording the plaintiffs an opportunity to replead." *Id.* (citing *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004)).

The Court reviews "each aspect of the trial court's injunction for an abuse of discretion." *Tex. Educ. Agency v. Hous. Indep. Sch. Dist.*, 660 S.W.3d 108, 116 (Tex. 2023). "A trial court abuses its discretion when it misapplies the law to established facts or when the evidence does not reasonably support the trial court's determination of probable injury or probable right of recovery." *City of Dallas v. Brown*, 373 S.W.3d 204, 208 (Tex. App.—Dallas 2012,

pet. denied). The Court defers to the trial court's fact findings if the evidence supports them but reviews legal determinations de novo. *State v. Loe*, 692 S.W.3d 215, 226 (Tex. 2024). The Court also views the evidence in the light most favorable to the trial court's order, indulges every reasonable inference in favor of the order, and defers to the trial court's resolution of conflicting evidence. *31 Holdings I, LLC v. Argonaut Ins. Co.*, 640 S.W.3d 915, 922 (Tex. App.—Dallas 2022, no pet.).

## ARGUMENT

**1. The trial court correctly denied the Commissioner's plea to the jurisdiction.**

### A. Appellees' claims are ripe.

The Commissioner argues that Appellees' claims are not ripe because their administrative bid protest appeals remain pending before the Commissioner. (EC Br. at 11.) The ripeness argument hinges on the contention that there can be no cognizable injury to Appellees until the Commissioner decides their pending bid-protest appeals. (EC Br. at 12.) But the Commissioner misconstrues the law and the testimony at the temporary-injunction hearing. Appellees face an imminent injury that is ripe for adjudication.

A dispute is ripe if "the facts are sufficiently developed 'so that an injury has occurred or is likely to occur, rather than being contingent or remote.'"

*Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 683 (Tex. 2020) (internal citations omitted). "A claimant is not required to show that an injury has already occurred, provided the injury is imminent or sufficiently likely." *S.O. v. Univ. of Tex.*, No. 03-16-00726-CV, 2017 WL 2628072, at *2 (Tex. App.—Austin June 15, 2017, no pet.). A declaratory-judgment claim is ripe when there is a live controversy, harm will occur if it is not resolved, and the declaration sought will "actually resolve the controversy." *Lynch*, 595 S.W.3d at 685; *see also Etan Indus., Inc. v. Lehmann,* 359 S.W.3d 620, 624 (Tex. 2011) ("[The UDJA] is intended as a means of determining the parties' rights when a controversy has arisen but before a wrong has been committed."). When a party asserts that a governmental actor is acting ultra vires, the party need not wait for a final agency determination before challenging the ultra vires action and seeking declaratory relief. *See Abbott v. Doe*, 691 S.W.3d 55, 76 (Tex. App.—Austin 2024, no pet.).

To argue that Appellees' claims are not ripe, the Commissioner selectively quotes portions of the hearing transcript about the status of the administrative appeals. (EC Br. at 12–13.) The Commissioner contends that "whether the Commissioner will proceed with the results from HHSC's procurement scoring or alter them in some way is far from certain." (EC Br. at

13.) This statement cannot be squared with the Commissioner's testimony. She testified that she believes that the procurement properly gave preference to historical quality ratings. (6RR:135.) She also testified that she tried to find a way to give awards to the children's health plans, but she "couldn't come up with a principled way to do it." (6RR:141.) Finally, she testified that at the time of the hearing, HHSC's position was that it was "not going to do anything different" other than move forward with the intended contract awards. (6RR:168.) This testimony shows that any statements about needing to resolve the administrative appeals are hollow references to technical procedures.

The Commissioner's arguments in opposition to Appellees' second motion to extend time to file their briefs in this Court also belie her argument that Appellees' claims are not ripe. (Appellant's Response in Opposition to Appellees' Second Joint Motion for Extension of Time to File Appellees' Briefs (filed Oct. 29, 2025).) The Commissioner urged the Court to deny the extension by arguing that the contracts she intends to award should go into effect as soon as possible. (*Id.* at 3.) The Commissioner unabashedly refers to the intended contract awardees as "the winning bidders" who should receive the taxpayer dollars at issue (*id.* at 2) and Appellees as the "wrong parties" to

receive any taxpayer dollars (*id.* at 4). The response indicates that the Commissioner believes there is nothing left to do before she executes those proposed contracts and that she intends to proceed with contract awards to those she has already determined are the "winning bidders." (*Id.*)

The Commissioner also disregards evidence of imminent harm. She testified that she "could execute the contracts *immediately* after denying the appeals." (6RR:147 (emphasis added).) That is, absent injunctive relief now, there would likely be no way for Appellees to stop the contracts' execution after the Commissioner denies the administrative appeals. The trial court heard uncontroverted evidence of the imminent harm that Superior is already suffering and will suffer from the contracts' execution. Superior's then CEO testified that "the harm would be immediate" following the contracts' execution. (7RR:113.) He described that once the contracts are executed, Superior will start losing employees, which will affect Superior's ability to perform under its current contract and result in reputational damage. (7RR:115.) He explained that as soon as the contracts are signed, Superior would suffer damage to its investment in its value-based contracted network. (7RR:116.) He also testified that if the contracts are signed, it would impact Superior's ability to

negotiate with providers in its network, as those providers would begin focusing on other health plans. (*Id.*) Similarly, plan participants would start looking at other plans. (7RR:117.) He noted that even though the contracts have not been signed, Superior is already "hearing reports of providers informing members that Superior has lost and is exiting service areas and encouraging them to switch plans." (*Id.*) He testified that this activity would intensify if the contracts are signed. (*Id.*) Thus, the evidence establishes (1) a live controversy about the legality of the Commissioner's actions and (2) imminent harm from that conduct. Thus, Appellees' claims are ripe for determination.

The cases the Commissioner cites for her ripeness arguments are distinguishable. She cites *Riner v. City of Hunters Creek*, 403 S.W.3d 919, 923–24 (Tex. App.—Houston [14th Dist.] 2013, no pet.), to support her argument that claims are not ripe while the administrative appeals are pending. In *Riner*, the plaintiffs complained that a city planning and zoning commission misconstrued an ordinance concerning lot size and that this was the primary reason the commission disapproved their plat. *Id.* at 921. But the commission's order identified 14 reasons for disapproving the plat. *Id.* The court of appeals found that the plaintiffs' claims were not ripe because they could not show that the

alleged mistaken interpretation of the lot-size ordinance had caused them injury or would soon do so. *Id.* at 924. The court noted that the alleged injury was hypothetical because it was contingent on (a) the plaintiffs' ability and willingness to eliminate their plat's other deficiencies, (b) the commission's disapproval of a revised plat, and (c) the board of adjustment's refusal to reverse the commission's continued disapproval or grant variances. *Id.* The court emphasized that the plaintiffs' declaratory-judgment claim focused on only one of the commission's 14 reasons for disapproving the plat (the lot-size ordinance) and merely assumed that the other bases would be resolved. *Id.* Thus, the court could not find that the lot-size ordinance "has caused [plaintiffs] a concrete injury, or will soon do so." *Id.*

Here, in contrast, the Commissioner's ultra vires conduct is *the* cause of the harm Appellees face. The administrative appeals' pendency does not affect this analysis. The Commissioner continues to take the position that she and HHSC complied with all applicable laws, and unless a court tells her otherwise, the Commissioner stands poised to deny the appeals and execute the contracts immediately thereafter. Thus, the alleged harm in *Riner* was materially more contingent and attenuated than the harm at issue here.

The Commissioner also cites *Marble Falls Independent School District v. Scott*, 275 S.W.3d 558, 567 (Tex. App.—Austin 2008, pet. denied). But that case addresses exhaustion of administrative remedies, not ripeness. And as discussed in Part 1.B., Appellees were not required to exhaust administrative remedies before seeking a declaration that the Commissioner is acting ultra vires. *Marble Falls* is also inapposite because the dispute was subject to the Administrative Procedure Act and statutory prerequisites to suit, and neither applies here. *See id.* at 567–68.

The facts here are more analogous to the facts in *Lynch*, which involved a dispute about the rights granted under a blanket easement. 595 S.W.3d at 684. The defendant argued that the claim was not ripe because plaintiffs' concerns stemmed from the easement's possible future use. *Id.* The Supreme Court acknowledged this but noted that the claims were "inextricably tethered to a present disagreement" about the easement's scope. *Id.* The Court also noted that declaratory-judgment actions "are often brought with an eye to future harm." *Id.* at 685. The Court held that the "present disagreement" (though narrower than the larger dispute) was sufficient to create a ripe dispute about the easement's scope. *Id.*

Similarly, there is a "present disagreement" here about the Commissioner's interpretation of the statutes governing the procurements, and Appellees have shown that they are likely to suffer harm if that controversy is not resolved. The harm is neither contingent nor remote. The dispute is therefore ripe for adjudication.

## B. Appellees were not required to exhaust administrative remedies before bringing their ultra vires suits.

Relatedly, the Commissioner argues that this Court lacks jurisdiction because Appellees should have exhausted their administrative remedies before filing suit. (EC Br. at 14.) But administrative exhaustion is not required when the plaintiff asserts a valid ultra vires claim. *See, e.g.*, *McGarry v. Houston Firefighters' Relief & Ret. Fund*, 680 S.W.3d 14, 34–35 (Tex. App.—Houston [1st Dist.] 2023, pet. denied). The Commissioner concedes that Texas courts have recognized that at least some ultra vires claims are exempt from the administrative-exhaustion requirement. (EC Br. at 16.) But she argues that the ultra vires exception applies only to claims where the administrative body wholly lacks authority to decide the issue. (*Id.*) That argument is premised on cases that predate the Texas Supreme Court's clarification about what constitutes an ultra vires claim.

In 2016, the Supreme Court decided *Houston Belt & Terminal Railway Co.* and clarified what constitutes an ultra vires claim. 487 S.W.3d at 163. In that case, the City of Houston argued that ultra vires claims are cognizable only when the official had no discretion whatsoever. *Id.* at 161. That is, according to the City, if the official had *any* discretion, no ultra vires claim could ever be brought. *Id.* The Supreme Court rejected that argument. *Id.* at 163. The Court instead held that ultra vires claims are cognizable to address "an officer's exercise of judgment or limited discretion without reference to or in conflict with the constraints of the law authorizing the official to act." *Id.* The Court reasoned that the purpose of ultra vires claims is not to "attempt to exert control over the state" but to "attempt to reassert the control of the state." *Id.* at 164. Thus, the issue is not whether the official has discretion or not, but whether the plaintiff adequately alleges that the official acted outside whatever authority the Legislature has granted. *Id.*

The Commissioner cites *Hensley v. State Commission on Judicial Conduct,* 692 S.W.3d 184, 194 (Tex. 2024), for the proposition that "when an available administrative remedy 'may moot the claim … the claim is barred.'" (EC Br. at 14–15.) But in that case, the Supreme Court concluded that the plaintiff did *not* have to exhaust her administrative remedies because "exhaustion would

be a pointless waste of time and resources." 692 S.W.3d at 194. That holding is fully consistent with the ultra vires exception's application. When the plaintiff has a viable claim that the official is acting outside the authority granted by the Legislature, requiring the plaintiff to complete the administrative process before bringing the claim in court is futile. That is particularly true here, where completing the administrative process would involve the Commissioner deciding whether her own conduct is ultra vires.

An ultra vires claim's purpose is to reassert the state's control over a wayward official. *Houston Belt*, 487 S.W.3d at 164. And the ultra vires exception to the exhaustion requirement recognizes that there is no reason to make a plaintiff wait through an administrative process to assert that the official conducting that process is acting without authority or beyond the scope of their authority. That purpose is fully satisfied here. There is no reason to force Appellees to complete the administrative process before bringing their claims that the Commissioner has acted and will continue to act outside her authority unless enjoined.

2. **The trial court correctly concluded that Appellees have a probable right to relief on their ultra vires claims.**

   A. **The Commissioner does not have unlimited discretion.**

The Commissioner argues for the first time on appeal that she cannot be acting ultra vires because Texas Government Code section 2155.144 grants her absolute discretion to award managed care contracts based solely on her determination of "best value." (EC Br. at 19.) She claims sole discretion to determine what factors to consider in deciding which contracts will provide the best value to the state and that she cannot act ultra vires. (*Id.*) The Commissioner is wrong.[7]

To begin with, although the Commissioner is generally required to use procurement methods that provide best value under section 2155.144, she also remains bound to comply with specific statutory requirements when awarding

---

[7] Aetna Better Health of Texas, Inc. argued in its brief that Appellees' ultra vires claims are not viable because Appellees did not sue the correct official. (Aetna Br. at 14.) Although Aetna is no longer a party to the appeal (and the Commissioner has not made this argument), this Court has a duty to examine its own jurisdiction. *E.g.*, *Tex. Propane Gas Ass'n v. City of Houston*, 622 S.W.3d 791, 797 (Tex. 2021). Superior therefore offers the following response. Aetna relies on *Hall v. McRaven*, 508 S.W.3d 232, 240 (Tex. 2016). In *Hall*, the defendant did not have statutory responsibility for the decision at issue. *Id.* at 240. Here, in contrast, the Commissioner has ultimate authority for the decisions at issue here. *See* Tex. Gov't Code § 524.0002. She conceded as much at the hearing. (6RR:141.) Moreover, she will be the official who executes the proposed contracts. (6RR:147.)

managed care contracts, including those in sections 533.003, 533.004, and 536.052(d). *See Wilson v. Cmty. Health Choice Texas, Inc.,* 607 S.W.3d 843, 846–47, 854 (Tex. App.—Austin 2020, pet. denied). These statutory mandates for managed care contracts reflect the Legislature's emphasis on provider networks to maintain access and quality, helping prevent contracts that result in substandard care. Nothing in section 2155.144 allows the Commissioner to disregard these statutory mandates.[8] Her argument for unfettered discretion would render those statutory requirements meaningless. *See Crosstex Energy Servs. LP v. Pro Plus, Inc.*, 430 S.W.3d 384, 390 (Tex. 2014) ("We must not interpret the statute 'in a manner that renders any part of the statute meaningless or superfluous.'" (internal citation omitted)).

Contrary to the Commissioner's argument, Appellees are not arguing that she merely misinterpreted the law. (EC Br. at 20 (citing *Hall*, 508 S.W.3d at 239.) Instead, as discussed in Part 2.B., the trial court correctly found that

---

[8] Aetna also argues that the Commissioner has unfettered discretion in how she decides the pending administrative appeals. (Aetna Br. at 20.) But in deciding the administrative appeals, the Commissioner is still bound by the same statutory requirements that govern the procurement. And as noted above, the Commissioner has already signaled exactly how she will decide the protest appeals if given the opportunity.

Commissioner failed to follow statutory mandates. In so doing, the Commissioner exceeded whatever discretion she has regarding this managed-care procurement and thus has acted (and will continue to act) ultra vires. *Houston Belt*, 487 S.W.3d at 158 ("A government officer with some discretion to interpret and apply a law may nonetheless act 'without legal authority,' and thus *ultra vires,* if he exceeds the bounds of his granted authority or if his acts conflict with the law itself.").

**B.  The trial court did not abuse its discretion in concluding that the Commissioner has acted (and will act) ultra vires.**

*(1)  Appellees have standing to challenge the Commissioner's ultra vires conduct.*

The Commissioner first asserts that Appellees lack standing to challenge her failure to apply the mandatory statutory preferences, arguing that Appellees must show that the failure caused Appellees to be passed over in the procurement process. (EC Br. at 23.) The sole case the Commissioner cites for this argument is a federal bid-protest case. (*Id.* (citing *Elcon Enters., Inc. v. Wash. Metro. Area Transit Auth.*, 977 F.2d 1472, 1483–84 (D.C. Cir. 1992).) But Appellees have not brought a bid protest; they seek a declaration that the Commissioner has acted (and will act) ultra vires. A bid-protest case is not instructive about standing for an ultra vires claim. The Commissioner cited no

authority for her contention that standing to bring an ultra vires claim requires such a narrow focus on the type of harm from the ultra vires conduct.

In any event, the Commissioner ignores federal bid-protest case law confirming that the "prejudice" necessary to standing includes a showing that "there was a substantial chance [the plaintiff] would have received the contract award but for th[e] error." *E&L Constr. Grp., LLC v. U.S.*, 159 Fed. Cl. 115, 119 (2022). A "substantial chance" includes the ability to compete if a rebid occurs, particularly where the challenger is an incumbent like Superior. *VAS Realty, LLC v. U.S.*, 26 F.4th 945, 949–50 (Fed. Cir. 2022); *Omniplex World Servs. Corp. v. U.S.*, 105 Fed. Cl. 706, 713–14 (2012) (recognizing that incumbency and being in the competitive range are relevant to establishing a "substantial chance" of being awarded a contract). Thus, the Commissioner's federal case law does not support her standing argument.

Moreover, contrary to the Commissioner's argument (EC Br. at 23), *Wilson v. Community Health Choice Texas, Inc.,* is instructive. The court did not limit its ruling to the fact that the plaintiff there was an entity qualifying for the mandatory contract award under section 533.004(a). *See* 607 S.W.3d at 854 (holding that by alleging that the Commissioner refused to award a contract in accordance with section 533.004(a), plaintiff alleged an ultra vires act).

The teaching of *Wilson* is that the "best value" provisions of the procurement statutes do not excuse the Commissioner's disregard of other statutory requirements. *Id.*; *see also, e.g.*, *Ritchie v. Rupe*, 443 S.W.3d 856, 867 (Tex. 2014) (holding that statutory construction requires focusing on "the language of the specific provision at issue, within the context of the statute as a whole, endeavoring to give effect to every word, clause, and sentence").

### (2) The "best value" analysis cannot trump other specific statutory requirements.

The Commissioner next contends that section 2155.144's general requirement to seek the best value somehow trumps any mandatory statutory preferences that the Commissioner deems in conflict with that directive. (EC Br. at 24.) Nothing in section 2155.144 states (or even suggests) that the best-value determination allows the Commissioner to ignore other statutory requirements. If the Commissioner argues there is a conflict among the statutes, this Court should be wary of finding conflict, particularly where the statutes can easily be harmonized. *See, e.g.*, *Duarte v. Disanti*, 292 S.W.3d 733, 735 (Tex. App.—Dallas 2009, no pet.) ("Finally, we do not give a statute meaning that conflicts with other provisions if we can reasonably harmonize the provisions."); *Sw. Life Ins. Co. v. Montemayor*, 24 S.W.3d 581, 585 (Tex. App.—

Austin 2000, pet. denied) ("Indeed when there is a positive and clear inconsistency between two statutes, courts must adopt a reading that harmonizes the statutes if at all possible."). The statutes can be harmonized here by concluding that the best-value determination must be made in light of all of the required statutory preferences and other mandates that apply to the procurement.[9]

The court in *Wilson* rejected the Commissioner's argument about section 2155.144's effect. There, the then-Commissioner pointed to section 2155.144(n) and likewise argued that "he could award the contracts to any entities that provided the best value" regardless of the mandatory contract requirement in section 533.004(a). *Wilson*, 607 S.W.3d at 853. The court disagreed, finding no conflict in requiring the Commissioner to adhere to both the "generally applicable best value requirements" in section 2155.144 and the requirement to award a contract in accordance with section 533.004(a), even over the Commissioner's arguments that this did not achieve best value. *Id.* at 854; *see also id.* at 846–47 (acknowledging that the Commissioner "must

---

[9] And even if the statutes were in conflict, the more specific statutes applicable to this managed-care procurement (including sections 533.003, 533.004, and 536.052) prevail over the more general statute, section 2155.144. *See* Tex. Gov't Code § 311.026; *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 901 (Tex. 2000).

comply with statutory requirements such as those found in chapter 2155 …, which addresses 'General Rules and Procedures' for purchasing" and also "must implement the Medicaid managed care program by contracting with MCOs in a manner consistent with chapter 533").

So too here. Although the Commissioner must comply with the generally applicable requirement to seek the best value, that does not mean she can ignore the mandatory statutory preferences and requirements in sections 533.003, 533.004, and 536.052(d) in awarding managed-care contracts. *See id.* at 854.[10]

### (3) The Commissioner's arguments about Appellees' conduct are also misplaced.

The Commissioner next argues that Appellees waived any complaints about the conduct of the procurement by not objecting until after the Commissioner issued the notice of intent to award contracts. (EC Br. at 25.) But Appellees could not have known the Commissioner would ignore the required

---

[10] The Commissioner's new argument that "best value" trumps all other considerations also runs counter to the Commissioner's intent to award a CHIP contract to every respondent in the procurement that claimed entitlement to a Medicaid mandatory contract under section 533.004, regardless of that respondent's score under the purported best-value criteria, including the respondent that came in *last place* out of all 18 respondents. (6RR:59, 157.)

statutory preferences until after the notice of intent to award was issued, particularly when the RFP—as the Commissioner agrees—indicated that HHSC would follow these statutes. (*Id.*)

The Commissioner also attempts to shift blame to Appellees for failing to include information in their bids about the mandatory statutory preferences. (EC Br. at 25.) But the statutes place the responsibility of effecting the mandates on the Commissioner and HHSC, not Appellees. TEX. GOV'T CODE § 533.003(a) ("In awarding contracts to managed care organizations, *the commission shall … .*" (emphasis added)); TEX. GOV'T CODE § 536.052(d) ("In awarding contracts to managed care organizations under [CHIP] and Medicaid, *the commission shall … give preference ….*" (emphasis added)). This argument is even more nonsensical because the Commissioner and HHSC already have access to information they would need to apply the mandates (such as quality metrics and information regarding provider networks) yet chose to ignore that information. (6RR:162–64; 5RR:162.)

Additionally, regardless of information provided by the bidders, the Commissioner failed to apply the mandates in sections 533.003(a)(1) and 536.052(d), which require preferences for certain plans based on their provider networks and quality metrics. The Commissioner failed to even train or

instruct the evaluators about the existence or application of the mandatory preferences. (5RR:88–89.) The evaluators' ignorance of the mandates is borne out by the results, as the proposed contract awards would eliminate the highest-ranked plan—including Superior in certain service areas—in 11 out of 13 regions, and the awarded plans lack participation from providers who have historically served Medicaid or charity care populations. (7RR:104–12.)

The Commissioner also violated section 2155.144 by failing to document consideration of past performance. HHSC deemed past performance a relevant factor in this procurement. (5RR:225–26.) Section 2155.144 mandates that HHSC document any factors considered relevant. *See* TEX. GOV'T CODE § 2155.144(c) ("The agency shall document that it considered all relevant factors under Subsection (d) in making the acquisition." (emphasis added)). The term "shall" is mandatory and leaves no room for discretion. *See* TEX. GOV'T CODE § 311.016(2) ("'Shall' imposes a duty"); *see also, e.g.*, *Frank v. Liberty Ins. Corp.*, 255 S.W.3d 314, 324 (Tex. App.—Austin 2008, pet. denied) (noting that the word "shall" in a statute is generally construed as creating a "mandatory duty").

Once HHSC deemed past performance a relevant factor under section 2155.144(d), it was required to specifically document past performance under

subsection (c), but it did not. (5RR:107–08, 168–69, 225–26.) Despite the stray comment the Commissioner cites as somehow showing documentation of the consideration of past performance, HHSC witnesses Kay Molina and James Ramirez could point to no documentation of past performance outside of generically referring to the entire procurement file. (5RR:227–28 (admitting past performance was not "an express and independent consideration"); *see also* 5RR:110–11 (conceding that "the words 'past performance' are [not] going to show up anywhere" in any evaluations of respondents' proposals.).) And the Commissioner rejected her own consultant's recommendation about documenting past performance. (5RR: 181.)

Despite the Commissioner's arguments to the contrary, section 2155.144 imposed a nondiscretionary duty upon the Commissioner to document all relevant factors considered under the statute in making the contract awards, including past performance, which she did not do. The Commissioner asserts that "entire procurement file" documents the relevant factors. (EC Br. at 21.) But as discussed above, the phrase "past performance" is not in the evaluation files. This gives rise to an ultra vires claim.

### (4) *The trial court did not abuse its discretion in finding that Appellees are likely to succeed on their claims that the Commissioner failed to apply statutory mandates.*

The Court should also reject the Commissioner's attempts to defend the conduct of the procurement. She first argues that she has "absolute discretion" to decide how to give the preference required by section 533.003. (EC Br. at 26.) She argues that it is permissible to apply the preference only if two MCOs would be otherwise tied. (*Id.*) But section 533.003(a)(1) is clear: "In awarding contracts to managed care organizations, the commission shall … give preference to organizations that have significant participation" by providers in the region who have traditionally provided care to Medicaid and charity care patients. Tex. Gov't Code § 533.003(a)(1). "Shall" is mandatory. *See, e.g.*, *Frank*, 255 S.W.3d at 324. Nothing supports the Commissioner's argument that she had the discretion to apply the preference only when she wished to, *e.g.*, in case of a tie or all things being equal. Arguing that there is some discretion in determining what "significant participation" means or who qualifies as a provider who has "traditionally provided care to Medicaid and charity care patients" does not absolve the Commissioner's complete disregard of the statutory requirement. There is no evidence that the

Commissioner applied any preference, let alone a preference that took into account any particular definition of these phrases.

The Commissioner also cannot rely on the best-value evaluation criteria or technical questions to show that HHSC somehow did apply the required section 533.003(a)(1) preference in the procurement. Section 533.003(a)(1) requires HHSC to give preference by region to those MCOs that *have* significant participation in the MCO's provider network from each health care provider in the region that has traditionally provided care to Medicaid and charity care patients. Thus, section 533.003(a)(1) mandates that HHSC give preference based on provider networks *already in place* in each region when HHSC makes contract awards. None of the best-value evaluation criteria or technical questions requested information about a respondent's existing provider network at all, let alone by region. And even the provisions the Commissioner cites do not relate expressly to providers who traditionally provide care to Medicaid and charity care patients, but "Providers" broadly. (*See* EC Br. at 26.) Nor were the evaluators given any information necessary to apply the preference, such as which providers traditionally provide care to Medicaid and charity patients, nor were they informed of any preference requirement. (5RR:98.)

The Commissioner next argues that she had substantial discretion in applying section 536.052(d) and applied the required preference through some of the best-value criteria and technical questions. (EC Br. at 28.) The record shows otherwise. Section 536.052(d) is clear and mandatory: the commission "shall" give preference either to an MCO that "meets quality of care and cost-efficiency benchmarks" as specified under the statute or to an MCO "that offers a managed care plan that successfully implements quality initiatives." TEX. GOV'T CODE § 536.052(d) (emphasis added).

The Commissioner did neither. She admits HHSC never developed the quality and cost-efficiency benchmarks referenced in section 536.052(d). Instead, she claims that she was proceeding under the subsection requiring consideration of which MCO has successfully implemented quality initiatives. (EC Br. at 28.) But she admitted in testimony before the House Human Services Committee that existing quality metrics were *not* considered in making the contract awards. (6RR:162–64; Ex. P-148 at 64–65.) HHSC merely considered what the respondents promised to do in the future. (*Id.*) That does not comply with the statute. Nor is it sufficient to argue that respondents should have submitted the relevant information for the preference's application

themselves; the statute assigns the responsibility to HHSC to grant the preference. TEX. GOV'T CODE § 536.052(d).

The Commissioner suggests that HHSC considered the information necessary to employ the preference by considering responses to Technical Question 13. (EC Br. at 29.) But the question did not ask about past performance or quality initiatives that any MCO was already implementing. (Ex. P-38 at 38.) Instead, it asked about "strategies and initiatives" that the bidder proposed to employ if awarded a contract. (*Id.*) This is consistent with the Commissioner's legislative testimony that the technical questions were "designed to elicit how an – an organization is going to fulfill those quality requirements." (Ex. P-148 at 64–65.) James Ramirez also confirmed that the procurement process did not consider or evaluate the quality initiatives previously implemented by any plan. (5RR:224–28.)

The Commissioner next disputes that she failed to ensure mandatory contracts under section 533.004 were awarded considering section 533.003(a)(1), which requires giving preference to organizations with significant participation in their provider network from health care providers in the region who have traditionally provided Medicaid and charity care. (EC Br. at 29.) As explained above, the Commissioner did not actually employ the preference

required by section 533.003(a)(1), and thus her argument that the selection of mandatory contracts was also under that provision falls flat. Indeed, the evidence shows that the only consideration in awarding a mandatory contract under section 533.004(a) was whether HHSC validated a claim of entitlement to a mandatory contract. (6RR:59, 157.) And contrary to what the Commissioner says, it is a question of the Commissioner's authority to choose a winner, and not a question of what "weight HHSC gave various factors." (EC Br. at 30.) The statutes that Appellees have identified outline clear, nondiscretionary duties that the Commissioner must perform when awarding managed-care contracts. She has failed (and will fail) to adhere to these statutes in implementing the proposed contract awards.

In sum, the procurement is governed by specific statutory provisions that require HHSC to use identified preferences in making contracting decisions. The Commissioner does not have discretion to disregard those requirements just because one of several statutes governing her authority in managed-care procurements directs her to seek the best value for the state. The evidence is more than sufficient to support the trial court's findings that the Commissioner has acted (and will continue to act) ultra vires. The trial court thus did

not abuse its discretion in finding that Appellees have a likelihood of success on the merits of their ultra vires claims.

### C. The disclosure to Aetna violated basic procurement law.

The trial court also correctly found that HHSC's wrongful disclosure of the proposals, including to Aetna's lawyers, destroyed the procurement's integrity and created an unlevel playing field. As a result, the intended contract awards were procured through a process that does not provide fair consideration of proposals as required by 1 T.A.C. section 391.209(3)(A), and that is not consistent, uniform, or transparent, as required by 1 T.A.C. section 391.101. There is no dispute that Aetna received the proposals. And in its brief filed in this Court before its appeal was dismissed, Aetna did not deny using them to its advantage. (Aetna Br. at 59.)

The Commissioner responds that all RFP respondents agreed to the application of the Public Information Act ("PIA") to their proposals, and that if HHSC mistakenly responded to a PIA request, that is simply a discretionary application of the PIA. (EC Br. at 32.) The Commissioner is wrong.

No one disputes that respondents knew that PIA versions of their proposals were eventually subject to public disclosure. But by wrongfully making the disclosure while the competitive evaluation process was still underway,

HHSC created an unlevel playing field and favored one bidder over others. Kay Molina agreed to the general proposition that proposals are protected until an award decision is made to protect the procurement's integrity, and she admitted that she knew of no other instance where a proposal was released before notices of intent to award were posted. (5RR:128–29.) Notably, the PIA proposals were wrongfully disclosed to Aetna, but not to all other respondents, before oral presentations, when Aetna could use the information for a unique advantage in its preparation. (5RR:136–40 (Kay Molina acknowledging the value of the prematurely-disclosed proposals to Aetna).)

The Commissioner points to the conclusory resolution of Superior's protest that, in HHSC's view, the premature disclosure did not affect the procurement. (EC Br. at 34.) But she ignores the evidence from the temporary-injunction hearing, including HHSC's own admission that the disclosure was wrongful. (5RR:138–39 (discussing correspondence in which HHSC employees admitted the proposals were disclosed in error and asked the recipient to destroy the copies); CR:3546–47, 3588–3639.) She also ignores the uncontradicted testimony of Superior's procurement expert that the disclosure violated standards of procurement law and fatally tainted the procurement. (6RR:16–17.)

In short, the Commissioner failed to show that the trial court abused its discretion in finding that the premature disclosure supports an injunction. The disclosure gave Aetna an advantage that other respondents lacked. And the Commissioner acted ultra vires in proceeding with the intended contract after the premature disclosure while the procurement was pending and will continue to act ultra vires if she awards and executes the contracts knowing of the wrongful disclosure.

## D. The trial court properly applied other statutory requirements.

The Commissioner next argues that the trial court "invented" statutory mandates in support of the temporary injunction. (EC Br. at 35.) But the trial court simply applied the plain language of the relevant statutes to the facts and found that Appellees have a probable right to relief on their claims sufficient to warrant a temporary injunction.

Texas Government Code section 533.0035(a) is one such clear, nondiscretionary statute: "Before the commission may award a contract under this chapter to a managed care organization, *the commission shall evaluate and certify that the organization is reasonably able to fulfill the terms of the contract*, including all requirements of applicable federal and state law." TEX. GOV'T CODE § 533.0035(a) (emphasis added). While the Commissioner contends that this

statute requires no investigation by HHSC, and that HHSC may simply rely on what is presented by the respondents (EC Br. at 36), the word "evaluate" in the statute plainly requires more than the self-certification that HHSC allowed. Contrary to the Commissioner's argument, she does not have absolute discretion to avoid her obligation to evaluate by simply accepting the respondents' self-serving representations.

The Commissioner also argues that there is no statutory basis to prohibit the procurement of CHIP and STAR services together. (CR Br. at 37.) This misconstrues Appellees' argument. Appellees do not assert that CHIP and STAR services may not be procured through the same RFP. But the statutes do prohibit awarding CHIP contracts under the Medicaid mandatory-contract requirements of section 533.004. The section expressly applies only to Medicaid managed care services, not CHIP, and is an exception to the general requirement of competitive procurement. *See Wilson*, 607 S.W.3d at 854 (holding that Texas Health & Safety Code section 62.155(a) mandates competitive procurement for CHIP contracts). Section 62.155(c)(1)'s statement that the Commissioner "*may* give preference to a person who provides similar coverage under the Medicaid program" does not change the analysis. Tex. Health & Safety Code § 62.155(c)(1) (emphasis added). Construed as

a whole, section 62.155 requires CHIP services to be procured through a competitive process. The mandatory-contract process in Section 533.004 is not competitive. The Legislature could have included CHIP in section 533.004. It did not.

The Commissioner boldly contends that "HHSC's decision to procure the CHIP piece with the mandatory STAR piece is consistent with the *best-value scoring to award the CHIP contracts competitively*" (EC Br. at 38 (emphasis added)), but this is demonstrably untrue. The CHIP contracts awarded to mandatory STAR contract recipients were not awarded based on any "best-value scoring." They were automatically given without regard to the score under the best-value criteria. That is how the *lowest-scoring of all 18 respondents stands to receive a mandatory CHIP contract*. (6RR:59, 157.)

### E. The Commissioner mischaracterizes the relief Appellees seek.

The Commissioner complains that Appellees "lack a judicially enforceable right to compel the Commissioner to redo the procurement because nothing in statute authorizes such relief" and argues that this relief would be barred by sovereign immunity as retroactive. (EC Br. at 38.) But this argument misstates the relief Appellees seek. The Commissioner does not cite any portion of the record where Appellees have sought an order compelling the

Commissioner to redo the procurement. (*Id.*) That is because there is no such pleading. Instead, Superior seeks (1) declarations that the Commissioner is required to comply with the statutes governing the procurement and that the Commissioner has failed and will continue to fail to comply with such statutes if the proposed contract awards are finalized and (2) an injunction stopping the Commissioner from proceeding with the proposed contract awards. (CR:3550–56.) If the courts grant that relief, the Commissioner would have the responsibility to determine the next steps to comply with the law.

The Austin Court of Appeals has already held that a suit to enjoin the Commissioner from executing a contract procured in violation of statutory requirements states a valid ultra vires claim. *Wilson*, 607 S.W.3d at 855. Thus, Appellees' similar claims are also cognizable. That is, by seeking to stop the Commissioner from violating the law, the claim seeks prospective relief. And injunctive relief to stop improper conduct is a recognized and proper remedy for an ultra vires claim.

Further, the cases the Commissioner cites to defeat the strawman argument she's offered are readily distinguishable. The Commissioner first cites *In re Stetson Renewables Holdings, LLC*, 658 S.W.3d 292, 297 (Tex. 2022)

(orig. proceeding) for the proposition that absent a legislatively crafted remedy, there is no remedy at all for ultra vires conduct. (EC Br. at 39.) But *Stetson* does not support that argument. A taxpayer sought mandamus relief ordering the Comptroller to process its application to participate in a tax incentive program. 658 S.W.3d at 293. The Supreme Court held that because the Legislature had expressly provided that the program ended on a date certain, a court could not order the Comptroller to process an application after that date. *Id.* at 299. Nothing in the opinion can reasonably be read to prevent the Court from holding the Commissioner to her statutory obligations in the context of her procurement duties, as Appellees seek here.

The Commissioner next cites *Morath v. Kingsville Independent School District*, 710 S.W.3d 918, 925 (Tex. App.—15th Dist. 2025, no pet.), for the proposition that "the lack of a legislatively mandated judicial remedy is fatal to [Appellees'] claims." (EC Br. at 39.) Again, the case does not support that proposition. The issue there was whether a school district was entitled to an order compelling the Commissioner of Education to cancel school district ratings rather than issuing them retroactively because they were not timely under the statute. 710 S.W.3d at 921–22. This Court held that issuing the ratings

retroactively was not an ultra vires act because the statute gave the Commissioner of Education broad discretion about the timing of issuance. *Id.* at 927. This case does not address what the remedy would have been if the commissioner was acting ultra vires.

Finally, the Commissioner cites *City of Austin v. Utility Associates, Inc.*, 517 S.W.3d 300, 312–13 (Tex. App.—Austin 2017, pet. denied), to argue that Appellees seek retrospective relief rather than prospective relief. (EC Br. at 41.) But that case establishes that Appellees are seeking prospective relief. In *Utility Associates*, the plaintiff sought injunctive relief to stop enforcement of an existing contract the city had previously executed. 517 S.W.3d at 312–13. The court held that this was improper retrospective relief. *Id.* Of course, here Appellees seek injunctive relief to stop the Commissioner from awarding and signing the contracts. That is prospective relief.

More fundamentally, the Commissioner's argument cannot be squared with the many cases recognizing that injunctive relief is proper to stop ultra vires actions. *See, e.g.*, *Matzen v. McLane*, 659 S.W.3d 381, 388 (Tex. 2021) ("Texas law recognizes 'ultra vires' claims seeking prospective injunctive relief against individual government officials in their official capacities."); *Phillips v. McNeill*, 635 S.W.3d 620, 627–28 (Tex. 2021) (noting that ultra vires

suits against government officials trace their roots "to courts' issuance of writs of habeas corpus, mandamus, and injunction against government officials to check acts in excess of lawful authority"); *Houston Belt*, 487 S.W.3d at 160 n.4 (noting that a successful plaintiff on an ultra vires claim is entitled to injunctive relief); *City of El Paso v. Heinrich*, 284 S.W.3d 366, 373, 376 (Tex. 2009) (same). In short, the relief Appellees seek is judicially cognizable.

### 3. The trial court correctly found that Superior faces irreparable harm without injunctive relief.

The Commissioner has not shown that the trial court abused its discretion in concluding that Superior faces irreparable harm without immediate injunctive relief. The Commissioner's irreparable-harm discussion does not challenge the trial court's fact findings that Superior will be harmed. (EC Br. at 46.) Instead, she argues that the harm does not result from the procurement process and that it is not irreparable. (*Id.*) But the trial court correctly found that Superior faces imminent, irreparable harm in the absence of injunctive relief.

### A. Superior established that it is threatened with imminent, irreparable harm.

The trial court made specific fact findings about the imminent, irreparable harm Superior faces. The court found that execution of the proposed contracts would begin transition activities toward new contracts that would substantially reduce the number of STAR & CHIP members that Superior serves today, causing real and immediate harm to Superior. (CR:5880–81; 7RR:104 (over 700,000 current Superior members will have to change plans if the Commissioner proceeds with the intended contract awards).) Contract execution would destabilize Superior's workforce, as its employees—already grappling with the uncertainty of their jobs in light of the intended awards— would be at heightened risk for targeted recruitment by competing MCOs. (CR:5880–81; 7RR:113–15.) Superior also demonstrated that, absent injunctive relief, the intended contract awards would jeopardize its provider networks by discouraging providers from contracting with Superior and diminishing Superior's bargaining power in provider negotiations. (CR:5880–81; 7RR:115–16.) The loss of employees and providers will make it difficult or impossible for Superior to continue providing the same level of service that it currently provides under its existing STAR & CHIP contracts through the end

of the term of those contracts. (CR:5880–81; 7RR:115.) This will not only hinder Superior's operations but will also cause reputational damage. (*Id.*)

Superior also presented evidence that it will begin losing membership immediately if the contracts are executed, even though the new STAR & CHIP contracts are not scheduled to be operational for some time. (CR:5880–81; 7RR:116–17.) Providers have already been informing Superior's members that Superior will no longer be providing STAR & CHIP services in certain areas of the state and are encouraging members to switch plans. (*Id.*) The confusion among providers and members alike will only worsen if the contract awards are executed notwithstanding the pending challenge to their legality. (*Id.*) Money damages will not be sufficient because the harm Superior will suffer will be extremely difficult to measure by any pecuniary standard. (CR:5882.) Moreover, money damages will not be sufficient because the state would claim immunity from any damages claims. (*Id.*)

The Commissioner did not offer any contrary evidence in the trial court. And on appeal, she does not challenge any of the trial court's fact findings about the harm Superior faces. (EC Br. at 46–48.) Instead, she asserts that the harm is not "imminent" because Appellees' claims are not ripe. (*Id.*) But as discussed in Part 1.A., Appellees' claims are ripe. For the same reasons, the

Court should reject the Commissioner's argument that the harm is not imminent.

**B. The Commissioner's other arguments about irreparable harm are unavailing.**

The Commissioner raises five other arguments about Appellees' harm, but none of them can support reversal of the temporary injunction. *First*, the Commissioner asserts that Appellees' "problem is not with the process but with the result." (EC Br. at 46.) But as discussed in Part 2, Appellees' complaints are about both the process and the result from that process. The result is unlawful *because* the process is unlawful. The trial court found that the process will result in "invalid and unlawful" contract awards. (CR:5878.) The Commissioner cites no authority for her assertion that Appellees have a burden to show that they would have been awarded additional contracts but for the unlawful procedure.[11]

*Second*, the Commissioner argues that beneficiaries having to change plans is not "irreparable harm," because those changes are inevitable consequences of re-procurement and may, in fact, be good for beneficiaries. (EC Br.

---

[11] Moreover, as discussed in Part 2.B.(1), federal bid-protest law (the Commissioner relies on) requires only a showing of a substantial chance that the plaintiff would have received an award.

at 46.) That argument misses the point. Appellees do not assert a property right to continuation of their contracts. The irreparable harm arises because beneficiaries will be forced to change plans (potentially for the worse) because of the Commissioner's ultra vires acts. The case the Commissioner cites for this argument is distinguishable. *Turner v. Joshua Indep. Sch. Dist.*, 583 S.W.2d 939, 942 (Tex. App.—Waco 1979, no pet.) (addressing a generic property right to contract renewal). That case has nothing to say about ultra vires claims. The Commissioner's mischaracterization of the relief Appellees seek also undercuts her argument that Appellees do not have cognizable harm. (EC Br. at 47.) As discussed in Part 3.A., Appellees have established that they face imminent, cognizable harm.

*Third,* the Commissioner's argument that contractual harms cannot be irreparable fares no better. Appellees are not pursuing a contractual remedy. They have viable ultra vires claims to ensure a procurement process in which they participated was conducted in accordance with law and are entitled to injunctive relief to prevent ultra vires actions. Appellees established that they face irreparable harm. As discussed in Part 1.A., the Commissioner has signaled that absent injunctive relief, she will proceed with executing the

proposed contracts and will likely argue that this action moots Appellees' claims.

*Fourth*, the Commissioner suggests that Appellees should have protested how HHSC would employ the mandatory statutory preferences before the notices of intent to award were issued. (EC Br. at 47.) But Appellees could not have known the Commissioner would ignore the statutory mandates until after the notices of intent to award were issued, particularly when the RFP expressly stated that HHSC would follow these statutes. (EC Br. at 4.)

*Fifth*, the Commissioner makes the absurd claim that Appellees' "position threatens the very structure of state government itself." (EC Br. at 48.) As discussed above, Appellees seek nothing more than to require the Commissioner to follow state law. The Commissioner has violated state law, not Appellees. The entire purpose of ultra vires claims is to reassert the state's control over the Commissioner's conduct of the procurement. *Houston Belt*, 487 S.W.3d at 164. This is not an argument against Appellees' irreparable harm.

## 4. The trial court correctly concluded that the equities weigh in favor of Appellees.

The trial court also examined the equities and concluded that they weigh in favor of injunctive relief, and the Commissioner has not shown that conclusion was an abuse of discretion. The Commissioner first argues that her interest and the public interest are the same. (EC Br. at 49.) But that argument ignores the context of this case. The only authority the Commissioner cites for this argument is an opinion from the Fifth Circuit about a constitutional challenge to a statute. (*Id.* (citing *Vote.Org v. Callanen*, 39 F.4th 297, 309 (5th Cir. 2022)). But in an ultra vires suit, the public's interests are *not* aligned with the defendant's interests. To the contrary, an ultra vires suit's purpose is "to reassert the control of the state" over an official who is acting contrary to law. *Houston Belt*, 487 S.W.3d at 164. Because the Commissioner's ultra vires acts are by definition unlawful, *id.*, her interests and the public's interests are not the same. Instead, the public has an interest in ensuring that the Commissioner complies with the laws enacted by their elected representatives. Thus, the public interest is served by an injunction that reasserts the state's control over an official who is acting contrary to law.

The Commissioner next argues that the injunction violates the separation of powers by interfering with her supposedly unlimited discretion to determine how to obtain the best value for the state. (EC Br. at 49.) That argument has two fatal flaws. First, as discussed in Part 2.A., the Commissioner does not have unlimited discretion. Second, an ultra vires suit does not violate the separation of powers because its purpose is to ensure that the Commissioner follows the law. *Houston Belt*, 487 S.W.3d at 164. The Commissioner has no right to violate the law. *See In re State*, 711 S.W.3d 641, 648 (Tex. 2024) (orig. proceeding) ("The County is not harmed by being required to follow the Texas Constitution.").

The Commissioner also argues that forcing 1.5 million vulnerable Texans to change health plans cannot support injunctive relief. (EC Br. at 50.) But her arguments again ignore the nature of this case. It is immaterial that beneficiaries can *choose* to change plans at any time. The Commissioner's ultra vires acts will force them to change. Which plans beneficiaries should be able to choose from should be determined by a lawful procurement process. Because the Commissioner has violated and will continue to violate the law, members' choices in many cases will not include their current plans, and they will be

limited to plans that HHSC itself has found to be lower quality with less developed provider networks. This constitutes harm to the public that the trial court properly considered.

Finally, the Commissioner argues that in the General Appropriations Act for the 2024-25 Biennium, the Legislature has expressed a policy preference against extensions of existing contracts. (EC Br. at 50–51.) According to the Commissioner, this provision "forecloses" the possibility of additional extensions of the existing contracts. (*Id.*) But the Commissioner ignores that the Legislature included the identical policy statements in the General Appropriations Act for the 2022-23 Biennium and the General Appropriations Act for the 2020-21 Biennium. *See* Act of May 31, 2021, 87th Leg., R.S., Ch. 1053, art. IX, § 17.09(e), 2021 Tex. Gen. Laws 2805, 3695; Act of May 27, 2019, 86th Leg., R.S., Ch. 1353, art. IX, § 17.10(e), 2019 Tex. Gen. Laws 4035, 4929. Those provisions did not stop the Commissioner from extending the existing contracts in 2020 after the last failed procurement. (5RR:180–81.) In fact, the Commissioner conceded that HHSC could extend the contract again, if needed. (6RR:145.) Thus, the policy statement in the most recent appropriations act has no impact on the propriety of injunctive relief. Moreover, nothing in that general statement of preference overrides the need to prevent ultra

vires actions by state officials and to conduct procurements in accordance with applicable law.

## 5. The Commissioner's other complaints lack merit.

### A. The injunction order complies with Rule 683.

The Commissioner for the first time asserts that the temporary-injunction order fails to comply with Rule 683 because it does not adequately set forth the reasons for its issuance. (EC Br. at 51.) This argument cannot support reversal because: (1) the Commissioner waived it by not complaining in the trial court and (2) the temporary-injunction order complies with the requirement to explain the reasons for its issuance.

#### (1) The Commissioner waived any complaint about the adequacy of the temporary-injunction order.

First, the Commissioner did not raise her complaints about the form of the temporary-injunction order in the trial court. This Court has not yet had occasion to decide whether complaints about an order's compliance with Rule 683 must be presented in the trial court to preserve them. But other Texas appellate courts have held that complaints that an order violates Rule 683 must be raised in the trial court or waived. *See, e.g.*, *Taylor Hous. Auth. v. Shorts*, 549 S.W.3d 865, 877 (Tex. App.—Austin 2018, no pet.); *Tex. Tech Univ. Health Sci. Ctr. v. Rao*, 105 S.W.3d 763, 768 (Tex. App.—Amarillo

2003, pet. dism'd); *Emerson v. Fires Out, Inc.*, 735 S.W.2d 492, 493–94 (Tex. App.—Austin 1987, no writ). In *Emerson*, the Austin Court of Appeals reasoned that familiar error-preservation rules required that the trial court be given a chance to address the appellant's complaints in the first instance. 735 S.W.2d at 494. The court held that "it serves no good purpose to permit appellants to lie in wait and present this error in form for the first time on appeal." *Id.* Instead, "on proper request, the district court could easily have added to the judgment" the findings that the appellant contended were required by Rule 683, but missing. *Id.* That procedure would have given the trial court the opportunity to cure the alleged error and "appellate review would have been facilitated." *Id.* The Austin Court of Appeals has repeatedly reaffirmed its reasoning and holding from *Emerson. See, e.g.*, *Taylor Hous. Auth.*, 549 S.W.3d at 877. This Court should adopt the same reasoning and rule and require appellants to present to the trial court any complaints about a temporary-injunction order's compliance with Rule 683.[12] Because the

---

[12] Other courts of appeals have disagreed with the Austin Court of Appeals' approach. *See Hoist Liftruck Mfg., Inc. v. Carruth-Doggett, Inc.*, 485 S.W.3d 120, 124 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (Frost, C.J., concurring) (discussing split among courts of appeals). But as Chief Justice Frost observed, the courts that require presentation in the trial court have the better reasoning. *Id.* This Court should adopt that better reasoning.

Commissioner did not present these arguments to the trial court, the Court should hold that they have been waived.

### (2) In any event, the temporary-injunction order complies with Rule 683.

Even if the Commissioner had not waived her Rule 683 complaints, they would still not offer a basis for reversal. The Commissioner complains that the injunction order fails to explain why the trial court found that Appellees have a probable right to relief and that "the order does not address the Commissioner's evidence or arguments concerning Plaintiffs' lack of irreparable harm." (EC Br. at 52–53.) Neither argument supports reversal.

The Texas Supreme Court has long held that Rule 683 does not require a temporary-injunction order to "set forth the reasons why the court believes it probable that the applicant will prevail on a final trial." *Transp. Co. of Texas v. Robertson Transports, Inc.*, 261 S.W.2d 549, 553 (Tex. 1953). Instead, the rule requires only that the order set forth "the reasons why the court believes the applicant's probable right will be endangered if the writ does not issue." *Id.*

Thus, the Commissioner's complaint about the lack of detail about Appellees' likelihood of success is misplaced. Rule 683 does not require the

explanation the Commissioner demands. If the Commissioner wanted detailed findings of fact and conclusions of law about the likelihood of success, she should have requested them under Rule 296. *See id.*

The Commissioner's complaint about the order's irreparable-harm findings is also misplaced. The Commissioner's sole argument is that "the order simply parrots Plaintiffs' arguments about the economic consequences of losing the contracts." (EC Br. at 53.) That is not a valid basis to attack an injunction's compliance with Rule 683. A temporary-injunction order is adequate if it identifies "the probable injury that will be suffered by appellees, why the injury is irreparable, and why appellees will have no adequate legal remedy if the injunction does not issue." *AutoNation, Inc. v. Hatfield*, 186 S.W.3d 576, 582 (Tex. App.—Houston [14th Dist.] 2005, no pet.). And in determining whether the order complies with Rule 683, the court looks only to the order itself. *Id.*

Here, the trial court's irreparable-harm findings span five single-spaced pages of the temporary-injunction order. (CR:5879–83.) The court made multiple, detailed findings about the injuries Appellees face, why those injuries

would be irreparable, and why Appellees would have no legal remedy if an injunction did not issue. (*Id.*) This is more than sufficient to comply with Rule 683.

### B. The trial court did not err in declining to admit the scoring rubrics.

The Commissioner also complains that the trial court declined to admit consensus scoring rubrics that she attempted to offer into evidence. (EC Br. at 53.) But the Commissioner has failed to address all of Appellees' objections to this evidence. For this reason alone, the Court should reject the Commissioner's argument on this point. In any event, the testimony she points to in this Court does not establish that the completed rubrics are business records. Nor can she show that the exclusion of those records was harmful error.

When the Commissioner first offered the completed rubrics into evidence, Appellees objected on two grounds: (1) the completed rubrics are hearsay and (2) the witness through whom they were offered had not reviewed them and therefore did not have personal knowledge to testify about them or their admissibility. (7RR:21–25.) The trial court correctly sustained both objections but suggested that she might be willing to reconsider if the Commissioner could present a witness with personal knowledge. (*Id.*) Later in

the hearing, the Commissioner made an offer of proof and proposed offering a business-records affidavit that had not been previously produced. (8RR:139, 145.) The parties and the court held a lengthy discussion about the documents and Appellees' objections. (8RR:139–58.) But the Commissioner does not even mention this interchange in her brief in this Court. (*See* EC Br. at 53–56.)

Appellees objected to the new offer on the basis that the Commissioner's representatives testified at their depositions that they had not reviewed all the completed scoring rubrics and that the application of the mandates was instead reflected in the "master rollup sheets" rather than the individual scoring rubrics. (8RR:140.) Appellees had requested that the corporate representatives be prepared to testify at their depositions about the mandatory statutory preferences, but they were not prepared to discuss the individual scoring rubrics. (8RR:145.) Appellees offered the deposition excerpts into evidence in support of their objection. (Ex. P-320.) They also cited and provided copies of authorities for the proposition that a corporate representative cannot disclaim knowledge of a subject at their deposition and then offer testimony on that subject at trial. (8RR:152–55.) As one example, they cited *Function Media, L.L.C. v. Google, Inc.*, No. 2:07–CV–279–CE, 2010 WL 276093, at *1 (E.D. Tex. Jan 15, 2010) ("When the 30(b)(6) representative claims ignorance

of a subject during the deposition, courts have precluded the corporation from later introducing evidence on that subject."). The Commissioner does not address this argument in her brief in this Court. (EC Br. at 53–56.)[13]

Appellees also objected on the basis of relevance because the Commissioner's representative testified at his deposition that the relevant score sheet was the "master rollup sheet" not the individual scoring rubrics. (8RR:145–46.) The Commissioner does not address this objection either. (EC Br. at 53–56.) Because she did not address all of Appellees' objections to the evidence, the Commissioner has waived any complaint about the exclusion. *E.g.*, *Cantu v. Horany*, 195 S.W.3d 867, 871 (Tex. App.—Dallas 2006, no pet.) ("When an appellee urges several objections to a particular piece of evidence and, on appeal, the appellant complains of its exclusion on only one of those bases, the appellant has waived that issue for appeal.").

Even if the Commissioner had preserved her argument, it would still not succeed. In this Court, she points to testimony from James Ramirez to try to establish that the completed rubrics are business records. (EC Br. at 55 (citing

---

[13] The Commissioner is therefore also wrong when she asserts that the trial court did not give a reasoned basis for her decision to sustain Appellees' objections. (EC Br. at 57.)

20RR:345–46).) The reliance on this testimony fails for several reasons. First, the cited testimony discusses a blank scoring rubric form (which was admitted into evidence), not the completed rubrics that the Commissioner complains about on appeal. (20RR:345–46.) Second, the testimony does *not* address the elements to make business records admissible. *Compare id.*, *with* Tex. R. Evid. 803(6). Nothing in the testimony the Commissioner points to addresses whether the records were made at or near the time of the events recorded, whether they were made by someone with knowledge, or whether the records were made in the course of a regularly conducted activity. That failure is unsurprising because the witness affirmatively testified that he had not reviewed the completed rubrics. (5RR:228; 6RR:216.) Thus, he could not provide the necessary testimony about them. The Commissioner therefore failed to show that the evidence is admissible under the business-record exception to the hearsay rule.

Because the evidence was properly excluded, the Court need not engage in a harmful error analysis. Even so, the Commissioner did not carry her burden to show that the exclusion was harmful. She asserts that the exclusion of the completed rubrics was harmful because knowing how each bidder scored

would be "crucial to deciding the question of whether the procurement process complied with applicable statutes." (EC Br. at 57.) But the Commissioner does not explain *how* the completed rubrics would show compliance with the statutes. And her representatives testified at their depositions that the "master rollup sheets" were the relevant documents, not the individual scoring rubrics. (Ex. P-320.)

The bare assertion that the evidence would have made a difference is not sufficient. As discussed above, the trial court heard ample evidence that the process failed to properly account for the statutorily required preferences. The Commissioner has not attempted to explain how the completed rubrics could have overridden all of that other evidence and caused a different result. The Commissioner thus has not carried her burden on appeal to show that the exclusion of this evidence was harmful. *See Gunn v. McCoy*, 554 S.W.3d 645, 666 (Tex. 2018) ("To reverse a trial court's judgment based on the exclusion of evidence, we must find that the trial court did in fact commit error, and that the error was harmful.").

## Conclusion and Prayer

The trial court correctly denied the Commissioner's plea to the jurisdiction. Appellees have asserted viable ultra vires claims, and those claims are

ripe for determination. The Commissioner has not established that the trial court abused its discretion in entering the injunction. The Commissioner does not have unfettered discretion to make procurement decisions. Rather, those decisions are subject to specific statutory requirements. And the trial court did not abuse its discretion in determining that it is likely that the Commissioner has violated (and will continue to violate) those requirements. Nor did the trial court abuse its discretion in concluding that the other requirements for injunctive relief are met here. Superior therefore requests that the Court affirm the trial court's denial of the Commissioner's plea to the jurisdiction and affirm the temporary injunction. Superior further requests general relief.

Dated: December 9, 2025

Respectfully submitted,

**Holland & Knight LLP**

By: */s/ Richard B. Phillips, Jr.*
    Richard B. Phillips, Jr.
    Texas Bar No. 24032833
    rich.phillips@hklaw.com

One Arts Plaza
1722 Routh Street, Suite 15500
Dallas, Texas 75201
(214) 964-9500 (telephone)
(214) 964-9501 (facsimile)

    Karen D. Walker
    *Admitted Pro Hac Vice*
    karen.walker@hklaw.com
    Tiffany Roddenberry
    *Admitted Pro Hac Vice*
    tiffany.roddenberry@hklaw.com

315 S. Calhoun Street, Suite 600
Tallahassee, Florida 32301
(850) 425-5612 (telephone)
(850) 224-8832 (facsimile)

**Attorneys for Appellee
Superior HealthPlan, Inc.**

## Certificate of Compliance

This brief complies with the typeface requirements of Tex. R. App. P. 9.4(e), because it has been prepared in Equity font in 14-point for text and 13-point for footnotes. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i), because it contains 14,809 words, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1).

/s/ Richard B. Phillips, Jr.
Richard B. Phillips, Jr.

TAB
A

CAUSE NO. D-1-GN-24-003839

| | | |
|---|---|---|
| COOK CHILDREN'S HEALTH PLAN; | § | IN THE DISTRICT COURT |
| TEXAS CHILDREN'S HEALTH PLAN; | § | |
| SUPERIOR HEALTHPLAN, INC.; and | § | |
| WELLPOINT INSURANCE COMPANY, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| CECILE ERWIN YOUNG, in her official | § | |
| capacity as Executive Commissioner of the | § | |
| Texas Health and Human Services | § | |
| Commission, | § | |
| | § | |
| Defendant. | § | 353rd JUDICIAL DISTRICT |

## TEMPORARY INJUNCTION AND ORDER DENYING DEFENDANT'S PLEA TO THE JURISDICTION

Before the Court are the Applications for Temporary Injunction (the "Applications") filed by Plaintiffs Cook Children's Health Plan ("Cook Children's"), Texas Children's Health Plan ("TCHP"), Superior HealthPlan, Inc. ("Superior"), and Wellpoint Insurance Company ("Wellpoint," and collectively, "Plaintiffs"); and the Plea to the Jurisdiction (the "Plea") filed by Defendant Cecile Erwin Young ("Defendant"), in her official capacity as Executive Commissioner of the Texas Health and Human Services Commission ("HHSC"). After considering Plaintiffs' Applications and Defendant's response; Defendant's Plea and Plaintiffs' responses; the pleadings and attached evidence in these consolidated cases (Nos. D-1-GN-24-003839, D-1-GN-24-003874, D-1-GN-004059, and D-1-GN-24-004327); the parties' prehearing briefing; the evidence admitted in the record and adduced at the hearing held on September 30, October 1, October 2, and October 4, 2024; applicable authorities; the arguments of counsel, and all other matters properly before the Court, the Court DENIES Defendant's Plea and GRANTS Plaintiffs' Applications.

162847251.2

The Court makes the following findings:

1.      The Court has subject-matter jurisdiction over the claims in these consolidated cases because Plaintiffs have alleged and offered evidence demonstrating that Defendant will act *ultra vires* in awarding, executing, and implementing the contracts arising out of Request for Proposals No. HHS0011152 (the "RFP" or "STAR & CHIP RFP") because she has acted *ultra vires* in administering the RFP. Plaintiffs properly seek only prospective relief—specifically, injunctive relief prohibiting Defendant from awarding, executing, or otherwise implementing the intended RFP contracts and thus preventing further unlawful acts in connection with Defendant's procurement or contracting processes, as well as accompanying declaratory relief. Accordingly, sovereign immunity does not bar Plaintiffs' claims or deprive the Court of subject-matter jurisdiction.

2.      The Court has personal jurisdiction over the parties in these consolidated cases.

3.      Venue is proper in this Court.

4.      Through the RFP, Defendant sought to procure managed care services for the State of Texas Access Reform ("STAR") Medicaid program and the Children's Health Insurance Program ("CHIP," and together with STAR, "STAR & CHIP").

5.      Plaintiffs allege that Defendant administered the RFP in a manner that violates Texas law and that, consequently, any award, execution, or implementation of the intended STAR & CHIP managed care contracts that Defendant announced on March 7, 2024, will constitute *ultra vires* acts.

6.      Plaintiffs have established a cause of action against Defendant and a probable right to the relief sought on their claims that Defendant has violated and, unless enjoined, will continue to violate statutory and regulatory requirements applicable to the RFP.

7.    Specifically, Plaintiffs have established that Defendant has violated and will continue to violate the Texas Government Code, Texas Health and Safety Code, and Texas Administrative Code in procuring managed care contracts for STAR & CHIP in Texas, and that any award, execution, or implementation of Defendant's intended contract awards would be unlawful, because:

- Defendant's intended contract awards will fail to give preference to managed care organizations ("MCOs") that have significant participation in their provider networks from each healthcare provider in the region who has traditionally provided care to Medicaid and charity care patients as required by Texas Government Code § 533.003(a)(1);

- Defendant's intended contract awards will fail to give preference to MCOs that have successfully implemented quality initiatives as required by Texas Government Code § 536.052(a) and (d);

- Defendant has failed to develop and implement the cost-efficiency and quality of care benchmarks mandated by Texas Government Code § 536.052(b) despite being subject to an obligation to do so for over a decade. Defendant's intended contract awards will likewise fail to give preference to MCOs that have met such benchmarks as required by Texas Government Code § 536.052(d);

- Defendant's intended contract awards will fail to consider MCOs' past performances as required by Texas Government Code § 2155.144;

- Defendant's intended contract awards will fail to evaluate and certify that MCOs are reasonably able to fulfill the terms of the STAR contract as required by Texas Government Code § 533.0035 and to review MCOs to confirm their ability to fulfill the requirements of the CHIP contract as required by Texas Health & Safety Code § 62.051(e);

- In August 2023 and again in October 2023, Defendant wrongfully disclosed the RFP proposals of Plaintiffs and other respondents—with the August disclosure recipients including legal counsel for Aetna, one of the competing respondents, while the procurement was ongoing and prior to completion of the oral presentations—thus, destroying any integrity of the procurement process and creating an unlevel playing field that cannot ensure fair consideration of all proposals and is far from consistent, uniform, and transparent as required by 1 Texas Administrative Code §§ 391.101 and 391.209;

- Defendant's intended contract awards will fail to implement the Medicaid managed care program in a manner that improves the health of Texans by promoting

continuity of care and provides a medical home for recipients as required by Texas Government Code § 533.002;

- Defendant's intended contract awards will fail to reduce administrative and other nonfinancial barriers for recipients as required by Texas Government Code § 533.002;

- Defendant's intended contract awards will fail to consider the need to use different managed care plans to meet the needs of different populations as required by Texas Government Code § 533.003(a)(3);

- Defendant's intended contract awards will unlawfully award mandatory CHIP contracts to MCOs to which Defendant intends to award mandatory STAR contracts in violation of Texas Health and Safety Code §§ 62.055 and 62.155;

- Defendant's intended award of mandatory CHIP contracts will fail to give consideration to statutorily required factors, including those under Texas Government Code § 533.003, in violation of Texas Government Code § 533.004(a);

- Defendant's continuing practice of denying relevant information about a procurement to bidders until after the deadline to submit a bid protest violates the Due Course of Law provision of Article I, Section 13 of the Texas Constitution by not providing a meaningful bid protest process after promising one in 1 Texas Administrative Code Chapter 391; and

- Defendant's continuing practice of refusing to consider as untimely any information submitted in supplemental protests and/or after the protest filing deadline is inconsistent with the procedural protections promised to protestants in bid protest rules that require consideration of a protest or appeal submitted after the filing deadline when good cause for delay is shown under 1 Texas Administrative Code § 391.307(d)(1).

8. These statutory and regulatory violations, each singly and together collectively, have resulted in intended contract awards that will be invalid and unlawful, and the further execution and implementation of such intended contract awards will be *ultra vires* acts.

9. Furthermore, Defendant is currently evaluating bids for STAR Kids, a separate Texas Medicaid managed care program, through Request for Proposals No. HHS0013071 (the STAR Kids RFP"). The procurement processes in the STAR & CHIP RFP and the STAR Kids RFP are substantively identical. Plaintiffs have demonstrated that Defendant has no intention of

voluntarily correcting her course of action for future procurements, including altering the processes and procedures used in administering the STAR Kids RFP. The resulting STAR Kids contract awards will therefore also violate statutory and regulatory requirements and be *ultra vires*.

10.     Plaintiffs have established a probable right to relief and that Defendant's award, execution, and implementation of the intended, unlawfully procured STAR & CHIP contracts will, if not enjoined, cause Plaintiffs to suffer imminent and irreparable injury.

11.     Cook Children's has established that execution and implementation of the contracts would result in irreparable harm to Cook Children's because:

- The loss of STAR & CHIP contracts threatens Cook Children's financial viability and might lead to the forced wind-down of the entity;

- Cook Children's participation in the STAR Kids program is in jeopardy because the larger STAR & CHIP contracts provide economies of scale to limit losses from STAR Kids;

- Cook Children's 100,000-plus STAR & CHIP members will be forced to change to different health plans from different companies, risking disruption to the members' healthcare and their access to their current primary care providers, specialty care providers, or both;

- Cook Children's has suffered immediate operational disruptions, including hiring difficulties and the delay of needed internal projects;

- Cook Children's can no longer negotiate a new pharmacy benefits contract alongside other Texas-only Medicaid plans and consequently will need to pay more for pharmaceuticals;

- Cook Children's 375 employees are at risk of losing their jobs—both the 70% of employees who focus on STAR & CHIP and the 30% who focus on STAR Kids; and

- New STAR & CHIP entrants in the Tarrant Service Area will likely poach Cook Children's experienced employees before the new contracts go into effect—thus threatening Cook Children's STAR & CHIP operations while it is still required to provide services under its current contracts.

12.     TCHP has established that execution and implementation of the contracts would result in irreparable harm to TCHP because:

- TCHP's 425,000 STAR & CHIP members will be forced to change their health plans, impacting their access to care;

- TCHP has suffered and will continue to suffer disruptions in workforce—threatening the future viability of the health plan—as employees voice concern about job security in light of the intended contract awards;

- TCHP's 650 employees are at risk of losing their jobs, impacting the financial health of its entire Texas Children's Health Care System beyond that of the health plan;

- TCHP has already suffered and will continue to suffer the poaching of its well-trained employees by other MCOs—further endangering its operations while it remains under contract with HHSC;

- TCHP will lose members and providers, further threatening the viability of the health plan and confusing members and providers;

- TCHP has and will suffer damage to its reputation and goodwill; and

- TCHP's participation in the STAR Kids program is at risk because the larger STAR & CHIP contracts are needed to provide economies of scale to limit losses from STAR Kids. If TCHP loses its STAR Kids contract, its 26,000 STAR Kids members would need to change their health plans, thereby adversely impacting those members' access to care, adversely impacting TCHP's workforce, adversely impacting TCHP's ability to operate and damaging TCHP's reputation and goodwill.

13. Superior has established that execution and implementation of the contracts would result in irreparable harm to Superior because:

- Superior will experience a reduction in the number of STAR & CHIP members it serves today, forcing members to change plans even before the operational start date of the new contracts;

- Superior will need to begin reducing its workforce just as new MCO entrants and MCOs expanding their membership will seek to poach Superior's employees, who are already grappling with the uncertainty of their jobs in light of the intended awards;

- Providers will be less likely to contract with Superior as contract renewals are being negotiated over the next few months and Superior's leverage in provider contract negotiations will be substantially diminished;

- Superior has made substantial investments in partnerships that promote HHSC's value-based care priorities. These partnerships involve risk-sharing agreements



between Superior and the partner entities and have been built to scale over time. Superior will lose the benefit of its initial investments in these partnerships; and

- Superior's ability to provide the same level of service currently provided under existing STAR & CHIP contracts through the August 31, 2025, expiration date will be diminished due to workforce challenges that would be caused by execution of the STAR & CHIP contracts, which will impact Superior's operations and cause it to suffer reputational damage.

14.     Wellpoint has established that execution and implementation of the contracts would result in irreparable harm to Wellpoint because:

- Almost 380,000 current Wellpoint members will be forced to change their health plan, thus losing access to their existing Wellpoint provider network;

- Wellpoint will be forced to consider substantial reductions in and/or relocations of its existing 1,200-plus-person workforce dedicated to the Texas Medicaid programs;

- Wellpoint has already suffered and will continue to suffer the poaching of its highly trained employees by other MCOs. During the review and transition period, which HHSC has stated will take at least a full year, Wellpoint must continue to provide uninterrupted healthcare to its members, and its ability to do so will be substantially jeopardized if there are key staff vacancies;

- Wellpoint has already suffered and will continue to suffer difficulty retaining its existing, robust provider network in the impacted service areas. Maintaining its network of healthcare providers is critical to Wellpoint's commitment to providing high-quality, cost-efficient healthcare for the entire duration of its existing contracts. Worse yet, Wellpoint has learned that some providers are informing members that Wellpoint will no longer be providing STAR & CHIP services in impacted areas and are encouraging them to switch plans on the basis of Defendant's intended contract awards;

- Wellpoint has made significant investments in service areas that it will be forced to exit and has longstanding provider partnerships with alternative payment models that were developed and built to scale over multiple years. Wellpoint will lose the benefit of its investments in those service areas and partnerships.

- There is no legal remedy that can fully compensate Wellpoint for (1) the loss of its members, (2) the harm to its business resulting from the intended, unlawfully procured contract awards, and (3) the harm to its ability to compete in a fair and lawful procurement process in future procurements; and

The harm to Wellpoint is imminent because Defendant did not follow the requirements of Texas law in procuring the STAR & CHIP contracts but



nevertheless intends to execute and begin implementing the intended, unlawfully procured contract awards. In addition, the harm to Wellpoint is imminent as Defendant does not intend to correct her unlawful course of action for future procurements or the ongoing STAR Kids RFP.

15. Plaintiffs have also presented evidence that they will begin losing STAR & CHIP members now, even though operations under the intended STAR & CHIP contract awards are not scheduled to start until September 1, 2025. Providers are already informing Plaintiffs' members that Plaintiffs will no longer be providing STAR & CHIP services in certain service areas of the state and are encouraging members to switch plans. The confusion among providers and members alike will only worsen if the intended contract awards are executed notwithstanding the pending challenge to their legality.

16. Money damages are not adequate compensation because the harms Plaintiffs will suffer cannot be measured by any certain pecuniary standard. Furthermore, Plaintiffs cannot be adequately compensated in damages because Defendant is immune from suit for damages and any limited waiver of immunity is insufficient to compensate for Plaintiffs' harms.

17. The harms to Plaintiffs outweigh any potential harms to Defendant or HHSC that would result from preserving the status quo during the pendency of these consolidated cases. Neither Defendant nor HHSC would be harmed if the execution and further implementation of the intended STAR & CHIP contracts are delayed given that (1) operations under the intended contract awards are not scheduled to start until September 1, 2025, and (2) HHSC has previously delayed the RFP several times and was able to continue providing coverage through the current STAR & CHIP contracts by extending the contracts in effect at the time.

18. The public will not suffer harm if a temporary injunction is granted but will suffer harm if Defendant executes and implements the intended, unlawfully procured contract awards. The intended contract awards will impose significant harm and confusion on millions of Texas's

STAR & CHIP members. More than 1.5 million Texans, mostly children—and 43% of the total STAR & CHIP population—will be forced to change health plans. This in turn would cause significant harms to those beneficiaries, for which there is no adequate remedy at law available against Defendant, including:

- Confusion among those beneficiaries due to difficulties in informing them of the change in available health plans;

- Disruption to those beneficiaries' access to care and continuity of care, thereby threatening the medical care and the very health and welfare of those beneficiaries; and

- Administrative burdens of finding new health plans and potentially new healthcare providers.

19. The injunctive relief Plaintiffs request is narrow in scope and tailored to prohibit Defendant from continuing to act *ultra vires*. The balance of equities and public interest weigh in favor of granting Plaintiffs' requested injunctive relief.

Accordingly, it is therefore ORDERED that Defendant's Plea to the Jurisdiction is DENIED.

It is further ORDERED that Plaintiffs' Applications for Temporary Injunction are GRANTED. The Court ORDERS that:

- Defendant, and all other persons or entities in active concert or participation with Defendant, shall refrain from awarding, signing, entering into, executing, implementing, or otherwise taking action to effectuate or perform any contracts resulting from or in connection with the STAR & CHIP RFP or to further the procurement or contracting processes for the STAR & CHIP RFP; and

- Defendant, and all other persons or entities in active concert or participation with Defendant, shall refrain from further proceeding with the procurement of, issuing a notice of intent to award or awarding contracts under, or otherwise implementing results from the STAR Kids RFP.



IT IS FURTHER ORDERED that Defendant shall provide notice of this Temporary Injunction to her officers, agents, servants, employees, and attorneys, as well as any persons or entities in active concert or participation with Defendant.

IT IS FURTHER ORDERED that Plaintiffs' bond or cash deposit in lieu of bond is set in the amount of $1,000.

IT IS FURTHER ORDERED that, on the filing by Plaintiffs of the bond and on approving the bond according to law (or the cash deposit in lieu of bond), the Clerk shall issue a Temporary Injunction in conformity with the law and the terms of this order.

IT IS FURTHER ORDERED that this Temporary Injunction shall not expire until final judgment in this case is entered or this case is otherwise dismissed by this Court.

IT IS FURTHER ORDERED that the trial on Plaintiffs' *ultra vires* claims seeking declaratory relief, permanent injunctive relief, and mandamus relief is set for November 3, 2025.

SIGNED on _October 4_, 2024.

_____
JUDGE PRESIDING

**Judge Laurie Eiserloh**
**455th District Court**

I, VELVA L. PRICE, District Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office

On 11/01/2024 09:28:21

VELVA L. PRICE
DISTRICT CLERK

By Deputy: SH

169317251.2

TAB

B

Vernon's Texas Statutes and Codes Annotated
    Government Code (Refs & Annos)
        Title 4. Executive Branch (Refs & Annos)
            Subtitle I. Health and Human Services
                Chapter 540. Medicaid Managed Care Program (Refs & Annos)
                    Subchapter E. Contract Administration

V.T.C.A., Government Code § 540.0204

Formerly cited as TX GOVT § 533.003

§ 540.0204. Contract Considerations Relating to Managed Care Organizations

Currentness

In awarding contracts to managed care organizations, the commission shall:

(1) give preference to an organization that has significant participation in the organization's provider network from each health care provider in the region who has traditionally provided care to Medicaid and charity care patients;

(2) give extra consideration to an organization that agrees to assure continuity of care for at least three months beyond a recipient's Medicaid eligibility period;

(3) consider the need to use different managed care plans to meet the needs of different populations; and

(4) consider the ability of an organization to process Medicaid claims electronically.

**Credits**

Added by Acts 2023, 88th Leg., ch. 769 (H.B. 4611), § 1.01, eff. April 1, 2025.

<Chapter 540 added as a nonsubstantive revision by Acts 2023, 88th Leg., ch. 769 (H.B. 4611) § 1.01, effective April 1, 2025.>

V. T. C. A., Government Code § 540.0204, TX GOVT § 540.0204
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

TAB
C

Vernon's Texas Statutes and Codes Annotated
    Government Code (Refs & Annos)
        Title 4. Executive Branch (Refs & Annos)
            Subtitle I. Health and Human Services
                Chapter 540. Medicaid Managed Care Program (Refs & Annos)
                    Subchapter E. Contract Administration

V.T.C.A., Government Code § 540.0203
Formerly cited as TX GOVT § 533.0035

§ 540.0203. Certification by Commission

Currentness

(a) Before the commission may award a contract under this chapter to a managed care organization, the commission shall evaluate and certify that the organization is reasonably able to fulfill the contract terms, including all federal and state law requirements. Notwithstanding any other law, the commission may not award a contract under this chapter to an organization that does not receive the required certification.

(b) A managed care organization may appeal the commission's denial of certification.

**Credits**
Added by Acts 2023, 88th Leg., ch. 769 (H.B. 4611), § 1.01, eff. April 1, 2025.

<Chapter 540 added as a nonsubstantive revision by Acts 2023, 88th Leg., ch. 769 (H.B. 4611) § 1.01, effective April 1, 2025.>

V. T. C. A., Government Code § 540.0203, TX GOVT § 540.0203
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 4. Executive Branch (Refs & Annos)
      Subtitle I. Health and Human Services
        Chapter 540. Medicaid Managed Care Program (Refs & Annos)
          Subchapter E. Contract Administration

V.T.C.A., Government Code § 540.0206

Formerly cited as TX GOVT § 533.004

§ 540.0206. Mandatory Contracts

Currentness

(a) Subject to the certification required under Section 540.0203 and the considerations required under Section 540.0204, in providing health care services through Medicaid managed care to recipients in a health care service region, the commission shall contract with a managed care organization in that region that holds a certificate of authority issued under Chapter 843, Insurance Code, to provide health care in that region and that is:

(1) wholly owned and operated by a hospital district in that region;

(2) created by a nonprofit corporation that:

(A) has a contract, agreement, or other arrangement with a hospital district in that region or with a municipality in that region that owns a hospital licensed under Chapter 241, Health and Safety Code, and has an obligation to provide health care to indigent patients; and

(B) under the contract, agreement, or other arrangement, assumes the obligation to provide health care to indigent patients and leases, manages, or operates a hospital facility the hospital district or municipality owns; or

(3) created by a nonprofit corporation that has a contract, agreement, or other arrangement with a hospital district in that region under which the nonprofit corporation acts as an agent of the district and assumes the district's obligation to arrange for services under the Medicaid expansion for children as authorized by Chapter 444 (S.B. 10), Acts of the 74th Legislature, Regular Session, 1995.

(b) A managed care organization described by Subsection (a) is subject to all terms to which other managed care organizations are subject, including all contractual, regulatory, and statutory provisions relating to participation in the Medicaid managed care program.

(c) The commission shall make the awarding and renewal of a mandatory contract under this section to a managed care organization affiliated with a hospital district or municipality contingent on the district or municipality entering into a matching funds agreement to expand Medicaid for children as authorized by Chapter 444 (S.B. 10), Acts of the 74th Legislature, Regular

Session, 1995. The commission shall make compliance with the matching funds agreement a condition of the continuation of the contract with the managed care organization to provide health care services to recipients.

(d) Subsection (c) does not apply if:

(1) the commission does not expand Medicaid for children as authorized by Chapter 444, Acts of the 74th Legislature, Regular Session, 1995; or

(2) a waiver from a federal agency necessary for the expansion is not granted.

(e) In providing health care services through Medicaid managed care to recipients in a health care service region, with the exception of the Harris service area for the STAR Medicaid managed care program, as the commission defined as of September 1, 1999, the commission shall also contract with a managed care organization in that region that holds a certificate of authority as a health maintenance organization issued under Chapter 843, Insurance Code, and that:

(1) is certified under Section 162.001, Occupations Code;

(2) is created by The University of Texas Medical Branch at Galveston; and

(3) has obtained a certificate of authority as a health maintenance organization to serve one or more counties in that region from the Texas Department of Insurance before September 2, 1999.

**Credits**
Added by Acts 2023, 88th Leg., ch. 769 (H.B. 4611), § 1.01, eff. April 1, 2025.

<Chapter 540 added as a nonsubstantive revision by Acts 2023, 88th Leg., ch. 769 (H.B. 4611) § 1.01, effective April 1, 2025.>

V. T. C. A., Government Code § 540.0206, TX GOVT § 540.0206
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 4. Executive Branch (Refs & Annos)
      Subtitle I. Health and Human Services
        Chapter 543A. Quality-Based Outcomes and Payments Under Medicaid and Child Health Plan Program
          Subchapter B. Quality-Based Payments Relating to Managed Care Organizations

V.T.C.A., Government Code § 543A.0052
Formerly cited as TX GOVT § 536.052

§ 543A.0052. Financial Incentives and Contract Award Preferences

Currentness

(a) The commission may allow a managed care organization participating in the child health plan program or Medicaid increased flexibility to implement quality initiatives in a managed care plan offered by the organization, including flexibility with respect to financial arrangements, to:

  (1) achieve high-quality, cost-effective health care;

  (2) increase the use of high-quality, cost-effective delivery models;

  (3) reduce the incidence of unnecessary institutionalization and potentially preventable events; and

  (4) in collaboration with physicians and other health care providers, increase the use of alternative payment systems, including shared savings models.

(b) The commission shall develop quality-of-care and cost-efficiency benchmarks, including benchmarks based on a managed care organization's performance with respect to:

  (1) reducing potentially preventable events; and

  (2) containing the growth rate of health care costs.

(c) The commission may include in a contract between a managed care organization and the commission financial incentives that are based on the organization's successful implementation of quality initiatives under Subsection (a) or success in achieving quality-of-care and cost-efficiency benchmarks under Subsection (b). The commission may implement the financial incentives only if implementing the incentives would be cost-effective.

(d) In awarding contracts to managed care organizations under the child health plan program and Medicaid, the commission shall, in addition to considerations under Section 540.0204 of this code and Section 62.155, Health and Safety Code, give preference to an organization that offers a managed care plan that:

(1) successfully implements quality initiatives under Subsection (a) as the commission determines based on data or other evidence the organization provides; or

(2) meets quality-of-care and cost-efficiency benchmarks under Subsection (b).

**Credits**
Added by Acts 2023, 88th Leg., ch. 769 (H.B. 4611), § 1.01, eff. April 1, 2025.

<Chapter 543A added as a nonsubstantive revision by Acts 2023, 88th Leg., ch. 769 (H.B. 4611) § 1.01, effective April 1, 2025.>

V. T. C. A., Government Code § 543A.0052, TX GOVT § 543A.0052
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Tab
F

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 10. General Government (Refs & Annos)
      Subtitle D. State Purchasing and General Services (Refs & Annos)
        Chapter 2155. Purchasing: General Rules and Procedures (Refs & Annos)
          Subchapter C. Delegations of and Exclusions from Comptroller's Purchasing Authority and Certain
          Exemptions from Competitive Bidding

V.T.C.A., Government Code § 2155.144

§ 2155.144. Procurements by Health and Human Services Agencies

Currentness

(a) This section applies only to the Health and Human Services Commission, each health and human services agency, the Department of Family and Protective Services, and agencies administratively attached to the Health and Human Services Commission. For the purposes of this section, the Department of Family and Protective Services or an agency administratively attached to the Health and Human Services Commission is considered a health and human services agency.

(b) An agency to which this section applies is delegated the authority to procure its goods and services, except as provided by this section.

(b-1) An agency to which this section applies is not delegated the authority to procure common commodities or services:

(1) including goods and services acquired for direct consumption or use by the agency in the day-to-day support of the agency's administrative operations, such as office supplies and equipment, building maintenance and cleaning services, or temporary employment services; and

(2) not including consulting services, professional services, health care services, information resources technology, goods or services acquired for the benefit or on behalf of clients of programs operated by the agency, procurements specifically authorized or delegated to the agency by statute, or the contracting out of agency purchasing functions or other administrative or program functions.

(b-2) The Health and Human Services Commission is delegated the authority to procure goods and services related to a contract for:

(1) a project to construct or expand a state hospital operated by a health and human services agency or a state supported living center as defined by Section 531.002, Health and Safety Code; or

(2) a deferred maintenance project for a health facility described by Subdivision (1).

(b-3) Notwithstanding any other law, the Texas Civil Commitment Office is delegated the authority to procure common commodities or services described by Subsection (b-1)(1) for office use if the total cost of the purchase is less than the total cost of the purchase under the comptroller's purchasing authority or as offered for sale as provided by Chapter 122, Human Resources Code. The Texas Civil Commitment Office, in collaboration with the comptroller, shall identify best practices for comparing the total costs and documenting cost savings.

(c) An agency to which this section applies shall acquire goods or services by any procurement method approved by the Health and Human Services Commission that provides the best value to the agency. The agency shall document that it considered all relevant factors under Subsection (d) in making the acquisition.

(d) Subject to Subsection (e), the agency may consider all relevant factors in determining the best value, including:

   (1) any installation costs;

   (2) the delivery terms;

   (3) the quality and reliability of the vendor's goods or services;

   (4) the extent to which the goods or services meet the agency's needs;

   (5) indicators of probable vendor performance under the contract such as past vendor performance, the vendor's financial resources and ability to perform, the vendor's experience and responsibility, and the vendor's ability to provide reliable maintenance agreements;

   (6) the impact on the ability of the agency to comply with laws and rules relating to historically underutilized businesses or relating to the procurement of goods and services from persons with disabilities;

   (7) the total long-term cost to the agency of acquiring the vendor's goods or services;

   (8) the cost of any employee training associated with the acquisition;

   (9) the effect of an acquisition on agency productivity;

   (10) the acquisition price; and

   (11) any other factor relevant to determining the best value for the agency in the context of a particular acquisition.

(e) Repealed by Acts 2003, 78th Leg., ch. 785, § 75(2).

(f) The state auditor may audit the agency's acquisitions of goods and services before or after a warrant is issued to pay for an acquisition.

(g) The agency may adopt rules and procedures for the acquisition of goods and services under this section.

(h) The Health and Human Services Commission shall adopt rules and procedures for the acquisition of goods and services under this section that apply to all health and human services agencies, including rules adopted with the commission's assistance that allow an agency to make purchases through a group purchasing program except when a better value is available through another procurement method. The rules of the health and human services agencies must be consistent with the rules of the Health and Human Services Commission.

(i) Subject to Section 524.0001(b), the Health and Human Services Commission shall develop a single statewide risk analysis procedure. Each health and human services agency shall comply with the procedure. The procedure must provide for:

(1) assessing the risk of fraud, abuse, or waste in health and human services agencies contractor selection processes, contract provisions, and payment and reimbursement rates and methods for the different types of goods and services for which health and human services agencies contract;

(2) identifying contracts that require enhanced contract monitoring; and

(3) coordinating contract monitoring efforts among health and human services agencies.

(j) Subject to Section 524.0001(b), the Health and Human Services Commission shall publish a contract management handbook that establishes consistent contracting policies and practices to be followed by health and human services agencies. The handbook may include standard contract provisions and formats for health and human services agencies to incorporate as applicable in their contracts.

(k) Subject to Section 524.0001(b), the Health and Human Services Commission, in cooperation with the comptroller, shall establish a central contract management database that identifies each contract made with a health and human services agency. The comptroller may use the database to monitor health and human services agency contracts, and health and human services agencies may use the database in contracting. A state agency shall send to the comptroller in the manner prescribed by the comptroller the information the agency possesses that the comptroller requires for inclusion in the database.

(l) The Health and Human Services Commission shall coordinate the procurement practices of all health and human services agencies and encourage those agencies to use efficient procurement practices such as the use of a group purchasing program, combining maintenance contracts into one contract, and obtaining prompt payment discounts. In implementing this duty, the Health and Human Services Commission may review the procurement and rate-setting procedures of each health and human services agency to ensure that amounts paid to contractors are consistent and represent the best value for the state. The Health and Human Services Commission may disapprove a procurement and rate-setting procedure of a health and human services agency. A health and human services agency may not use a procurement or rate-setting procedure that has been disapproved by the commission. The Health and Human Services Commission may transfer the procurement functions of a health and human

services agency to another appropriate state agency if it determines that transferring those functions would be advantageous to the state. Other state agencies and institutions with experience in acquiring goods and services using the procedures allowed under Subsections (c) and (d) shall on request assist the Health and Human Services Commission to perform its functions under this section.

(m) Subject to Section 524.0001(b), the Health and Human Services Commission shall develop and implement a statewide plan to ensure that each entity that contracts with a health and human services agency and any subcontractor of the entity complies with the accessibility requirements of the Americans with Disabilities Act of 1990 (42 U.S.C. Section 12101 et seq.).

(n) To the extent of any conflict, this section prevails over any other state law relating to the procurement of goods and services except a law relating to contracting with historically underutilized businesses or relating to the procurement of goods and services from persons with disabilities.

(o) If the Health and Human Services Commission does not receive any responsive bids on a competitive solicitation for goods or services for a state hospital operated by a health and human services agency or a state supported living center as defined by Section 531.002, Health and Safety Code, the commission after making a written determination that competition is not available may negotiate with and award the contract to any qualified vendor who meets the requirements of the original solicitation:

(1) at a price consistent with the current market value of the goods or services; and

(2) for a term not to exceed five years.

(p) In this section, "health and human services agency" has the meaning assigned by Section 521.0001.

**Credits**
Added by Acts 1997, 75th Leg., ch. 1045, § 1, eff. Sept. 1, 1997. Amended by Acts 1999, 76th Leg., ch. 1460, § 3.11, eff. Sept. 1, 1999; Acts 2003, 78th Leg., ch. 309, § 7.07, eff. June 18, 2003; Acts 2003, 78th Leg., ch. 785, § 75(2), eff. Sept. 1, 2003; Acts 2007, 80th Leg., ch. 937, § 1.09, eff. Sept. 1, 2007; Acts 2015, 84th Leg., ch. 837 (S.B. 200), § 2.08(b)(3), eff. Sept. 1, 2015; Acts 2019, 86th Leg., ch. 953 (S.B. 65), § 16, eff. Sept. 1, 2019; Acts 2021, 87th Leg., ch. 621 (S.B. 1896), § 15, eff. June 14, 2021; Acts 2021, 87th Leg., ch. 855 (S.B. 799), § 9, eff. Sept. 1, 2021; Acts 2023, 88th Leg., ch. 351 (S.B. 1179), § 17, eff. Sept. 1, 2023; Acts 2023, 88th Leg., ch. 769 (H.B. 4611), § 2.20, eff. April 1, 2025; Acts 2025, 89th Leg., ch. 1145 (S.B. 1610), § 27, eff. Sept. 1, 2025.

V. T. C. A., Government Code § 2155.144, TX GOVT § 2155.144
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

TAB

G

Vernon's Texas Statutes and Codes Annotated
　Health and Safety Code (Refs & Annos)
　　Title 2. Health
　　　Subtitle C. Programs Providing Health Care Benefits and Services
　　　　Chapter 62. Child Health Plan for Certain Low-Income Children (Refs & Annos)
　　　　　Subchapter D. Child Health Plan

V.T.C.A., Health & Safety Code § 62.155

§ 62.155. Health Plan Providers

Currentness

(a) The commission shall select the health plan providers under the program through a competitive procurement process. A health plan provider, other than a state administered primary care case management network, must hold a certificate of authority or other appropriate license issued by the Texas Department of Insurance that authorizes the health plan provider to provide the type of child health plan offered and must satisfy, except as provided by this chapter, any applicable requirement of the Insurance Code or another insurance law of this state.

(b) A managed care organization or other entity shall seek to obtain, in the organization's or entity's provider network, the participation of significant traditional providers, as defined by commission rule, if that organization or entity:

(1) contracts with the commission or with another agency or entity to operate a part of the child health plan under this chapter; and

(2) uses a provider network to provide or arrange for health care services under the child health plan.

(c) In selecting a health plan provider, the commission:

(1) may give preference to a person who provides similar coverage under the Medicaid program; and

(2) shall provide for a choice of at least two health plan providers in each service area.

(d) The executive commissioner may authorize an exception to Subsection (c)(2) if there is only one acceptable applicant to become a health plan provider in the service area.

**Credits**
Added by Acts 1999, 76th Leg., ch. 235, § 1, eff. Aug. 30, 1999. Amended by Acts 2003, 78th Leg., ch. 198, § 2.52, eff. Sept. 1, 2003; Acts 2015, 84th Leg., ch. 1 (S.B. 219), § 3.0205, eff. April 2, 2015.

V. T. C. A., Health & Safety Code § 62.155, TX HEALTH & S § 62.155

Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Richard Phillips on behalf of Richard Phillips Jr.
Bar No. 24032833
Rich.Phillips@hklaw.com
Envelope ID: 108912478
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Appellee Superior HealthPlan, Inc.'s Response Brief
Status as of 12/10/2025 7:17 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Michaelle Peters | | mpeters@scottdoug.com | 12/9/2025 6:21:11 PM | SENT |
| Julie Wright | | julie.wright@nortonrosefulbright.com | 12/9/2025 6:21:11 PM | SENT |
| Amanda DoddsPrice | | amanda.price@squirepb.com | 12/9/2025 6:21:11 PM | SENT |
| Karen Burgess | 796276 | kburgess@burgesslawpc.com | 12/9/2025 6:21:11 PM | SENT |
| Mark Emery | 24050564 | mark.emery@nortonrosefulbright.com | 12/9/2025 6:21:11 PM | SENT |
| Robert Johnson | 10786400 | rjohnson@foley.com | 12/9/2025 6:21:11 PM | SENT |
| Richard Phillips | 24032833 | Rich.Phillips@hklaw.com | 12/9/2025 6:21:11 PM | SENT |
| J McCaig | 24070083 | meghan.mccaig@outlook.com | 12/9/2025 6:21:11 PM | SENT |
| Michelle Ku | 24071452 | mku@foley.com | 12/9/2025 6:21:11 PM | SENT |
| Joseph Knight | 11601275 | jknight@ebbklaw.com | 12/9/2025 6:21:11 PM | SENT |
| Amy Warr | 795708 | awarr@adjtlaw.com | 12/9/2025 6:21:11 PM | SENT |
| Warren Huang | 796788 | warren.huang@nortonrosefulbright.com | 12/9/2025 6:21:11 PM | SENT |
| Paul Trahan | 24003075 | paul.trahan@nortonrosefulbright.com | 12/9/2025 6:21:11 PM | SENT |
| Susan Harris | 6876980 | susan.harris@nortonrosefulbright.com | 12/9/2025 6:21:11 PM | SENT |
| Anna Baker | 791362 | abaker@adjtlaw.com | 12/9/2025 6:21:11 PM | SENT |
| Cory Scanlon | 24104599 | cory.scanlon@oag.texas.gov | 12/9/2025 6:21:11 PM | SENT |
| Mandy Patterson | | mpatterson@adjtlaw.com | 12/9/2025 6:21:11 PM | SENT |
| Michelle Joyner | | mjoyner@scottdoug.com | 12/9/2025 6:21:11 PM | SENT |
| William FCole | | William.Cole@oag.texas.gov | 12/9/2025 6:21:11 PM | SENT |
| Abril Rivera | | arivera@scottdoug.com | 12/9/2025 6:21:11 PM | SENT |
| Nancy Villarreal | | nancy.villarreal@oag.texas.gov | 12/9/2025 6:21:11 PM | SENT |
| Kayla Ahmed | | kayla.ahmed@nortonrosefulbright.com | 12/9/2025 6:21:11 PM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Richard Phillips on behalf of Richard Phillips Jr.
Bar No. 24032833
Rich.Phillips@hklaw.com
Envelope ID: 108912478
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Appellee Superior HealthPlan, Inc.'s Response Brief
Status as of 12/10/2025 7:17 AM CST

Case Contacts

| Kayla Ahmed | | kayla.ahmed@nortonrosefulbright.com | 12/9/2025 6:21:11 PM | SENT |
|---|---|---|---|---|
| Kristin Hernandez | | kristin.hernandez@foley.com | 12/9/2025 6:21:11 PM | SENT |
| Thomas Coulter | 4885500 | tom.coulter@nortonrosefulbright.com | 12/9/2025 6:21:11 PM | SENT |
| Victoria Gomez | | victoria.gomez@oag.texas.gov | 12/9/2025 6:21:11 PM | SENT |
| Jessie Johnson | | jessie.johnson@nortonrosefulbright.com | 12/9/2025 6:21:11 PM | SENT |
| Benjamin Grossman | | bjgrossman@foley.com | 12/9/2025 6:21:11 PM | SENT |
| Cory Scanlon | | cory.scanlon@oag.texas.gov | 12/9/2025 6:21:11 PM | SENT |
| Cheryl LaFond | 24104015 | clafond@scottdoug.com | 12/9/2025 6:21:11 PM | SENT |
| David Johns | | david@cobbjohns.com | 12/9/2025 6:21:11 PM | SENT |
| Jennifer Cook | | Jennifer.Cook@oag.texas.gov | 12/9/2025 6:21:11 PM | SENT |
| Juliana Bennington | | jbennington@perkinscoie.com | 12/9/2025 6:21:11 PM | SENT |
| Jonathan Hawley | | jhawley@perkinscoie.com | 12/9/2025 6:21:11 PM | ERROR |
| Trisha Marino | | tmarino@perkinscoie.com | 12/9/2025 6:21:11 PM | SENT |
| Perkins Docketing Team | | DocketSEA@perkinscoie.com | 12/9/2025 6:21:11 PM | SENT |
| Katie Dolan-Galaviz | | kgalaviz@burgesslawpc.com | 12/9/2025 6:21:11 PM | SENT |
| Karen Walker | | karen.walker@hklaw.com | 12/9/2025 6:21:11 PM | SENT |
| Tiffany Roddenberry | | tiffany.roddenberry@hklaw.com | 12/9/2025 6:21:11 PM | SENT |
| Stacey Obenhaus | | sobenhaus@foley.com | 12/9/2025 6:21:11 PM | SENT |
| Jason R.LaFond | | jlafond@scottdoug.com | 12/9/2025 6:21:11 PM | SENT |
| Matthew Gordon | | mgordon@perkinscoie.com | 12/9/2025 6:21:11 PM | SENT |
| Jeffrey Stephens | | jeff.stephens@oag.texas.gov | 12/9/2025 6:21:11 PM | SENT |
| Stacey Jett | | sjett@adjltaw.com | 12/9/2025 6:21:11 PM | SENT |
| Victor Hernandez | | victor.hernandez@oag.texas.gov | 12/9/2025 6:21:11 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Richard Phillips on behalf of Richard Phillips Jr.
Bar No. 24032833
Rich.Phillips@hklaw.com
Envelope ID: 108912478
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Appellee Superior HealthPlan, Inc.'s Response Brief
Status as of 12/10/2025 7:17 AM CST

Case Contacts

| Victor Hernandez | | victor.hernandez@oag.texas.gov | 12/9/2025 6:21:11 PM | SENT |
|---|---|---|---|---|
| Mohmed Patel | | mohmed.patel@oag.texas.gov | 12/9/2025 6:21:11 PM | SENT |